KREBʳOZEN RESEARCH FOUNDATION & others *vs.* BEACON PRESS, INC.

Suffolk.    February 8, 1956. — May 3, 1956.

Present: QUA, C.J., RONAN, SPALDING, COUNIHAN, & WHITTEMORE, JJ.

*Equity Jurisdiction*, Defamation, Publication, Personal rights. *Constitutional Law*, Freedom of speech, Freedom of the press. *Public Policy. Words*, "Malicious," "Fraudulent."

The general equity jurisdiction extends in appropriate instances to enjoining defamation in order to protect personal rights as well as property rights from injury.  [91–93]

Both the constitutional guaranties of freedom of speech and freedom of the press and the public interest precluded a court of equity from enjoining publication and distribution of a book concerning a certain drug which was still the subject of research and great controversy as a remedy in the treatment of cancer, even if the book in its tenor as a whole and in various specific passages was defamatory of the drug and of persons engaged in such research.  [94–99]

BILL IN EQUITY, filed in the Superior Court on April 6, 1955.

The suit was heard by *Hurley, J.,* on demurrer.

*James D. St. Clair,* for the plaintiffs.

*Victor H. Kazanjian, (Hervey W. King* with him,) for the defendant.

WHITTEMORE, J.    The plaintiffs seek to enjoin publication and distribution by the defendant of a book allegedly entitled either " 'Krebiozen': The Great Cancer Mystery," or "The Great Cancer Mystery," by George D. Stoddard. This is the plaintiffs' appeal from the interlocutory decree

sustaining the defendant's demurrer and from the final decree dismissing the bill of complaint. There was no error.

The plaintiff Krebiozen Research Foundation is identified in the bill as an Illinois nonprofit corporation. The plaintiff Andrew C. Ivy is described as a medical doctor and physiologist, head of the department of clinical science at the University of Illinois, who has been engaged "for over five years in research and clinical investigation of said drug in his capacity as scientific advisor of said Krebiozen Research Foundation." The plaintiffs Marko Durovic and Stevan Durovic are stated to be the proprietors of Duga Laboratories which owns the manufacturing rights to produce Krebiozen. The bill states, "Dr. Durovic is a medical doctor who developed said drug, Krebiozen. He has worked with Dr. Ivy in research and investigation to determine the efficacy of said drug in the treatment of cancer." Included quotations from the subject book indicate that the reference is to Stevan Durovic.

The defendant is described as a Massachusetts business corporation, the publisher of the subject book, which publishes and distributes books widely for sale throughout the United States. It is alleged that galley proofs of the book have already been published and distributed and that the book is about to be put on general public sale.

The bill states that "Being a drug in the experimental stage, Krebiozen's therapeutic merits have yet to be conclusively established in the United States."

It is alleged also that "Dr. Ivy and Dr. Durovic have performed a thorough, painstaking, basic research on the drug involving the use of many animals and hundreds of case reports supplied by physicians of cancer patients throughout the United States. (See Exhibit 'A.')" The reference is to a thirty page booklet attached to the bill of complaint entitled "Report on Krebiozen. An agent for the treatment of cancer. Its clinical pharmacodynamic and chemical properties 1951–1954. By the Krebiozen Research Foundation." Twenty-three pages of print in the exhibit are summaries of what one hundred doctors are stated to

have said about approximately one hundred twenty-five patients, each doctor and patient being identified by initials.

The bill recites that the plaintiffs believe and allege the book "to contain false, fraudulent, wrongful, malicious and erroneous statements which tend to injure and destroy the good name and professional reputation of the . . . [plaintiffs] and the commercial value of the drug, Krebiozen." It also alleges that certain specified statements[1] and other statements and the whole tenor of the book "expressly or impliedly state that the . . . [plaintiffs] are trying to promote a secret remedy without adequate scientific research and that . . . [the plaintiffs] know their remedy to be worthless . . . , [and] are designed and will have the effect of impeding further clinical investigation of said drug and its commercial marketability in foreign countries where its sale is licensed." The bill specifies that the statements quoted in the bill and other statements and the whole tenor of the book libel Dr. Durovic and Dr. Ivy in charging them with having acted unethically and violated professional standards, with using testimonials from patients contrary to professional standards, with the promotion of secret remedies for personal profits, with shoddy and careless re-

---

[1] The quotations from the book are as follows:

"The 'Krebiozen' program — given a few more months without inspection from outside agencies or official resistance, sustained by testimonials from hundreds of obscure patients and a few prominent ones, all dying of cancer — . . . ."

"There must have been considerable expense also in gathering testimonials from cancer patients."

"Dr. Ivy was depending now upon the subjective testimonials that came to him from many quarters — not upon the objective tests demanded by his profession."

"In the case of 'Krebiozen,' secrecy was the watchword of its advocates and subjective testimonials their chief evidence."

"He, (Dr. Durovic) originated, and planned to market, the secret 'Krebiozen' remedy."

"In the case of 'Krebiozen,' Dr. Ivy and his associates, in full charge of the research for three years, did not undertake any controlled studies of the effect of cancer upon animals or patients."

"It will be clear that I am suspicious of the competence and integrity of Dr. Durovic and his brother Marco."

"In short the whole procedure is such as to raise grave doubts not only as to the competence of Dr. Durovic and the efficiency of the drug but as to the very existence of the latter."

"It is my considered opinion that, except possibly as a common, harmless, inexpensive ingredient, *Krebiozen does not exist.*"

search, and with uncritical indorsement of remedies. It also alleges that the publication of the book will cause irreparable damage to the professional reputations of the plaintiffs as doctors and scientists, and will subject them to professional suspicion, contempt and "ostracization" and to public contempt and ridicule, and that the trade name of the drug will be irreparably injured.

The specifications of the bill indicate that in some respects the statements in the book do not warrant the general allegations made about it. For example, the bill makes the point that the author of the book knows that the suggestions of nonprofessional reliance on paid testimonials from patients are false. But the relevant quoted words are, "There must have been considerable expense also in gathering testimonials from cancer patients" and ". . . subjective testimonials [were] their chief evidence." These words do not charge that any payments were made to patients. There would presumably be expense in getting the medicine out to doctors for testing and getting back and collating reports, and for aught that appears that is the expense referred to. The one hundred twenty-five or so reports in exhibit A show that the plaintiffs were making use of favorable reports from doctors about patients, and were presenting this part of the available data much in the way testimonial material direct from patients is often presented by those who sell medicines with the use of testimonials. The contents of these reports, to some extent at least, reflect subjective aspects of the reported illnesses.

And while it is questionable how far the defendant's motivation will be of controlling significance in a case of a writing in a field of public interest (see *Near* v. *Minnesota,* 283 U. S. 697, and footnote, page 97, *post*), it is to be noted that the bill here does not make out a case of active malice in the defendant — of a purpose to injure the plaintiffs or their business rather than an intent to publish a book about a controversial subject.

The summary allegation that the false statements are "malicious" is usual in a libel suit. The word is one of art

Krebiozen Research Foundation *v.* Beacon Press, Inc.

in such pleading and does not carry the import of "actual malice" (*Commonwealth* v. *Bonner,* 9 Met. 410; *Kenney* v. *McLaughlin,* 5 Gray, 3, 5; *Goodwin* v. *Daniels,* 7 Allen, 61, 63; *Conner* v. *Standard Publishing Co.* 183 Mass. 474, 480; and see G. L. [Ter. Ed.] c. 231, § 92). The word "fraudulent" without specification does not advance the pleader (*Garst* v. *Hall & Lyon Co.* 179 Mass. 588; *Nye* v. *Storer,* 168 Mass. 53; *Second Society of Universalists in Boston* v. *Royal Ins. Co. Ltd.* 221 Mass. 518, 523; *Cosmopolitan Trust Co.* v. *S. L. Agoos Tanning Co.* 245 Mass. 69, 73). These words are used in the bill in respect of the statements in the book and not as to the defendant's actions. That the defendant had refused in spite of the plaintiffs' efforts to let the book be seen (efforts made, as asserted, "to offer proof as to the inaccuracy of certain statements . . . [allegedly] libellous") is consistent with sound business procedure. The quotations from the book suggest the probability that the author is moved by strong feeling, but whatever their implications as to his aim they do not bear with any critical force on the motives of the publishing defendant.

We judge the bill here as one the full import of which is that the defendant publishing company is publishing a book in a controversial field [1] charged with the public interest

---

[1] That there is a public controversy in print about Krebiozen is disclosed in the pamphlet exhibit A attached to the bill. We quote from page 7.

"INVESTIGATION OF CONTROVERSY ON KREBIOZEN AND
CONCLUSION OF LEGISLATIVE COMMISSION OF
ILLINOIS GENERAL ASSEMBLY

While the clinical studies of Krebiozen were still in progress and before any report of the findings was published, certain individuals publicly expressed much very unfortunate criticism which has been premature, inaccurate and misleading. This unscientific and unusual criticism of an experimental work before it had been completed and its results published gave rise to the appointment by the 68th Illinois General Assembly of a Joint Committee of Fourteen Legislators to investigate the Krebiozen Controversy. The Committee later became a Legislative Commission to continue the work after the adjournment of the Illinois Legislature, on July 1, 1953.

On March 25, 1954, the Commission issued an interim Report in which it was unanimously concluded:

a) That further study and research on Krebiozen should be continued.
b) That Dr. Stevan Durovic and Mr. Marko Durovic on the basis of the record are men of good character.
c) That the personal integrity of Dr. A. C. Ivy is above reproach.
d) That 'his (Dr. Ivy's) conduct of Krebiozen research was in conformity with the highest ethical and humanitarian plane, and that his testimony

which is false in whole tenor and in certain details and known in certain respects by the author to be false and which will damage professional reputation and business property.

### EQUITY HAS JURISDICTION TO ISSUE AN INJUNCTION.

In *Menard* v. *Houle*, 298 Mass. 546, 547–548 (where the defendant was with words and acts letting the people of Springfield know he thought the plaintiff sold automobiles which were lemons), we summarily reviewed the decisions of this court in respect of the right to enjoin defamation. In that decision we said, "The defendant relies upon *Boston Diatite Co.* v. *Florence Manuf. Co.* 114 Mass. 69, wherein it was held that equity jurisdiction does not extend to cases of libel or slander or of false representations as to the character or quality of the plaintiff's property or as to his title thereto which involve no breach of trust or of contract. See also . . . [cases cited].  But later cases have held that equity will take jurisdiction where there is a continuing course of unjustified and wrongful attack upon the plaintiff motivated by actual malice, and causing damage to property rights as distinguished from 'injury to the personality affecting feelings, sensibility and honor' (*Choate* v. *Logan,*

---

before the Commission reaffirmed in our minds his reputation as a great scientist.'

e) That as to Dr. George Stoddard, who resigned as the President of the University of Illinois on July 25, 1953, at the height of the controversy over Krebiozen on a vote of no-confidence by University Trustees, the Commission concluded that 'untactful handling of his public statements added to the controversy.' "

And the reports from doctors expressly referred to in the bill are preceded by a paragraph reading, "A complete description of these patients as well as of all others in the files of the Krebiozen Research Foundation, together with laboratory and X-ray findings will be given in Dr. Ivy's forthcoming 'Observations on Krebiozen . . .' an extensive study of 550 Krebiozen-treated cases."

Also on page 27 of exhibit A a doctor's report on a patient concludes, "In spite of the fact that recent periodicals have remarked that Krebiozen is of no benefit, I feel that this patient has made sufficient improvement to continue therapy with it."

Were we to assume that all these parts of the exhibit were incorporated in the bill as allegations of fact they would extend to a degree the implications of the bill and suggest that the author's views and statements relate in part at least to past controversy and a desire for vindication of a position taken which could conceivably have had a part in his resignation.  But a showing in the bill of such motivation of the author would not materially change the case in its controlling aspects.

240 Mass. 131, 135), even though false statements and false announcements are the means or are among the means employed, and that in such cases there is no adequate remedy at law. . . . [Cases cited.] This case [*Menard* v. *Houle*] falls within the principle of the cases last cited." And see *Kenyon* v. *Chicopee*, 320 Mass. 528, 533.

In *Lawrence Trust Co.* v. *Sun-American Publishing Co.* 245 Mass. 262, it was held on demurrer that the plaintiff made out a case for equitable relief on allegations of many and repeated editorials containing false and misleading statements made with sole intent to harm the bank and its property by persuading depositors to discontinue their business with the complainant bank.

The plaintiffs urge that we should make express the implications of the more recent cases and now rule that, even absent the special circumstances emphasized in those cases, an injunction may issue to protect not only rights of property but also rights of personality from irreparable harm by defamation.

The plaintiffs in support of their argument refer to the statement in *Menard* v. *Houle*, 298 Mass. 546, 548, that "There is evidence of a process of evolution which may be still in progress," to the strong attacks by commentators on the rule of the *Boston Diatite Co.* case (see Pound, Equitable Relief Against Defamation & Injuries to Personality, 29 Harv. L. Rev. 640, 658), to the substantial erosion of the principle asserted in *Boston Diatite* by our own holdings (these are cited in *Menard* v. *Houle*) and to some of the language in those decisions (for example, "[It] arose before this court had complete equity jurisdiction," *Aronson* v. *Orlov*, 228 Mass. 1, 11), to the asserted present willingness of English courts to grant injunctions "against a libel if it is clearly shown to be one, exactly as in case of any other tort" (Pound, *ibid.*, 665), and to the asserted trend of Federal decisions (citing *Black & Yates, Inc.* v. *Mahogany Association Inc.* 129 Fed. [2d] 227 [C. C. A. 3], 1941).

In support of the desired extension to include personal rights in the protection to be given by equity from injury

by defamation the plaintiffs appropriately refer to our holding in *Kenyon* v. *Chicopee*, 320 Mass. 528, 534, where in the course of reversing decrees sustaining demurrers to a bill to enjoin the enforcement of an ordinance which forbade public distribution of handbills and the like, we said, "We believe the true rule to be that equity will protect personal rights by injunction upon the same conditions upon which it will protect property rights by injunction." And see *Mark* v. *Kahn*, 333 Mass. 517, 520, applying this rule.

The opinion in *Boston Diatite Co.* v. *Florence Manuf. Co.* 114 Mass. 69, gave no reason for the rule there stated. Critical analysis (Pound, *ibid.*, 658 et seq.) has shown how little real support was given by the cited English cases. The more recent holdings of this court and statements in them, culminating in the broad statement of principle in *Kenyon* v. *Chicopee*, establish, contrary to the rule earlier stated, that equity jurisdiction does extend to cases of libel and slander. And see Restatement: Torts, § 937, comment a. Whether it is to be exercised, however, depends as in every case where the jurisdiction is invoked to protect interests of property or personality, or both, upon all the relevant circumstances. It is apparent that the constitutional protection of free speech and public interest in the discussion of many issues greatly limit the area in which the power to give injunctive relief may or should be exercised in defamation cases. Chafee, Government & Mass Communications, 88–90. 69 Harv. L. Rev. 875, 944–945. Leflar, Legal Remedies for Defamation, 6 Ark. L. Rev. 423, 434–436.[1] *Ryan* v. *Warrensburg*, 342 Mo. 761, 771–772. Compare *Kwass* v. *Kersey*, 139 W. Va. 497, 516; *Montgomery Ward*

---

[1] The statement by Leflar that "When in rare cases courts today [1952] do enjoin publications they always insist that the thing actually restrained is not the libel or slander as such but the extrinsic property tort which happens to include some improper use of words," may be an overstatement as applied to a possible case of alleged libel where no property interest is shown but where also there appears no aspect of public interest. His statement, however, that "today equity courts are if anything less ready to enjoin defamations than they were twenty or thirty years ago when Pound and Chafee felt that this procedure might quickly afford the relief that clearly was needed from the inadequacies of the law's remedy for the tort" (page 435), may reflect increased recognition of the effect of the free speech considerations in all but the exceptional case.

*& Co.* v. *United Retail, Wholesale & Department Store Employees of America, C. I. O.* 400 Ill. 38, 43–46.

We need not pause for a more precise definition than our cases now afford of the line dividing the special situations in which equity should exercise its jurisdiction to restrain the use of words from those in which public policy or constitutional provisions stay its hand. In this case it is clear that the public interest in the discussion of the subject of cancer and the constitutional protection of a free press are paramount.

### An Injunction was Properly Denied because of Constitutional Rights and the Public Interest.

The plaintiffs urge that there is no protection for dissemination of what is admittedly false and they stress the rule that, to test the bill, the demurrer in a sense admits its allegations.[1] The plaintiffs ask, "Is an attack on efficacy and existence of a drug, the therapeutic merits of which are still under investigation . . . of such overriding public interest that the . . . [plaintiffs] should be powerless to stop defamatory statements concerning themselves and the drug?" We think the answer is "Yes."

The establishment of the truth about Krebiozen as soon as possible is critically important to the public. If it is a cure it will be one of the great discoveries of modern times; if it is of value in some cases only the limitations are important; if it is of no value lives may be saved and suffering avoided by the establishment of the fact. If there are aspects of the present investigation of the drug which do not meet accepted standards, knowledge of that fact will assist experts who must appraise the available data and will aid cancer patients and their medical advisors in determining whether to concern themselves with the drug in the present period. It is axiomatic in our society that full in-

---

[1] While to test whether the demurrer will lie it is necessary to assume that the allegations of the bill may be proved true, the fact of demurring is of course not an admission by the defendant that the defendant cannot prove the truth of the statements complained of or that he will not undertake to do so if the case is tried.

formation and free discussion are important in the search
for wise decisions and best courses of action. In a particu-
lar case, to be sure, new discovery may be impeded by a
false and unjust attack. Discoveries by persistent innova-
tors sometimes confound the skeptics who believe they
know all about presently accepted principles and what, be-
cause of those principles, can and cannot be done. We
grant that it could conceivably be here, as claimed, that
this attack which the demurrer admits for present purposes
to be false and defamatory will impede progress in the test-
ing of Krebiozen. But basing a rule on that possibility
would end or at least effectively emasculate discussion in
the very controversial fields where it is most important.
And it is hard to believe that the publication of a critical
book, even though it contains false statements and is of
false tenor overall, will prevent the full testing of any sub-
stance which in fact shows to the profession any promise of
curing or alleviating cancer.

Mr. Chafee has answered the plaintiffs' question (Gov-
ernment & Mass Communications, pages 91–92): "One may
ask, 'What is the value of letting people read false state-
ments?' That is not quite the whole story. In the first
place, the matter in question may not be wholly false.
Along with the lies and distortions may go a good deal of
truth, which the public ought to read and will never read
if the publication be prohibited. An injunction cannot very
well discriminate in such cases; it must root up the wheat
with the tares. . . . Furthermore, we cannot safely as-
sume that the statements are really false. All we know is
that the plaintiff and the judge call them false. If the judge
could suppress the whole publication because of his opinion
about a few items, he would be a sort of censor. One man's
judgment is not to be trusted to determine what people
can read. . . . So our law thinks it better to let the de-
famed plaintiff take his damages for what they are worth
than to intrust a single judge (or even a jury) with the
power to put a sharp check on the spread of possible
truth."

In *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 249–250, we said that "the 'liberty of the press' which, under art. 16 of the Declaration of Rights, 'ought not . . . to be restrained in this commonwealth' . . . [is a freedom] comparable to the rights of 'freedom of speech' and 'of the press' . . . declared in the First Amendment to the Constitution of the United States, and held to be part of the 'liberty' protected by the Fourteenth Amendment against abridgment by a State without due process of law. . . . '. . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.' Hughes, C.J., in *Lovell* v. *Griffin*, 303 U. S. 444, 452. 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' Ibid., quoting from *Ex parte Jackson*, 96 U. S. 727, 733."

These statements are applicable here. It is of course important historically to understand that liberty of the press in its eighteenth century connotation meant primarily if not exclusively liberty to publish without previous license. But it is now well established, as stated in the *Bowe* case (page 250), that "freedom from the need of previous license by no means satisfies the constitutional guaranty. Authors and publishers are entitled to a high degree of protection from legal accountability for what they write and publish. *Thornhill* v. *Alabama*, 310 U. S. 88, 101, 102."

This case under the Constitution of the United States is substantially controlled by *Near* v. *Minnesota*, 283 U. S. 697. In that case a Minnesota statute provided that one who engaged in the business of regularly and customarily producing and publishing a malicious, scandalous and defamatory newspaper, magazine or other periodical is guilty of a nuisance and may be enjoined. The State sought an injunction under the statute to prevent Near from publishing a newspaper in which scandalous and defamatory statements were made about public officials. The statute was held unconstitutional. It is true, as the plaintiffs point out, that that case is stronger in that the statute there if

applied would suppress future editions of the newspaper, but the grounds stated by the court are applicable to what would be done by injunction here. Much is made in that case of the importance of free discussion of office holders and of political matters. But we think that the discussion of a possible or alleged cure of one of the great scourges of mankind is substantially of the same rank as a matter for public discussion. The words of Chief Justice Hughes (page 721) are apt which show that allowing prior restraint, provided only a judge is convinced of the falsity of the proposed publication, amounts to unconstitutional censorship.

While in that case the complainant was the State and here the complainants are those whose private property and personal rights are affected, the Minnesota officials who were libelled had of course private rights at stake, and the fact that a public interest against the publication of a scandalous newspaper could be shown was an argument in the *Near* case against the decision of the court. It was found in the *Near* case (page 706) that "the editions in question were 'chiefly devoted to malicious, scandalous and defamatory articles.'"[1]

Other decisions of the United States Supreme Court state the compelling arguments against prior restraint of publication, which in reality must mean *restraint* of publication. *Patterson* v. *Colorado*, 205 U. S. 454, 462. *Grosjean* v. *American Press Co. Inc.* 297 U. S. 233, 249–250. *Lovell* v. *Griffin*, 303 U. S. 444, 451–452. *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 503. *Superior Films, Inc.* v. *Department of Education of Ohio*, 346 U. S. 587, 588.

The plaintiffs rely upon the statement in *Beauharnais* v. *Illinois*, 343 U. S. 250, 266, that libellous utterances are not within the area of constitutionally protected free speech.

---

[1] The constitutional point was not made in *Lawrence Trust Co.* v. *Sun-American Publishing Co.* 245 Mass. 262 (1923), where intentional disparagement of business was stressed. But the *Near* case shows that motivation may be unimportant if the discussion is in a field charged with the public interest. The soundness of banks may be such a field. The opinion in *Baldwin* v. *Commissioner of Banks*, 283 Mass. 423, 424, shows that in 1931 the Lawrence Trust Company was insolvent and its liquidation had begun.

The statement must be read in its context. The appellant in that case had been convicted for distributing anti-negro pamphlets under a statute making unlawful any publication of described kinds which "portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens . . . which . . . exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots." The pamphlets included the statement, "If persuasion and the need to prevent the white race from becoming mongrelized by the negro will not unite us, then the aggressions . . . rapes, robberies, knives, guns and marijuana of the negro, surely will." The statute was upheld as a form of criminal libel law. The court noted that every American jurisdiction punishes criminal libel without raising constitutional problems and held that group libels have the same status in this respect as individual libels and that as construed and applied the statute did not violate the Fourteenth Amendment. Even so there were four dissenting opinions in some of which are strong statements of the proposition that constitutional rights of free speech had been invaded. Perhaps in the last analysis how a given case is decided will depend upon the principal aspect of what the defendant has done and the nature of the public interest in the particular matter to which the subject words relate. If so, it may be noted in respect of the words quoted from the *Beauharnais* pamphlet that "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution . . ." (*Cantwell* v. *Connecticut*, 310 U. S. 296, 309–310) and that, in that case, there was a public interest, shown by the statute, against discussion of race relations in an inflammatory way. Here the great public interest is in the untrammelled discussion of cancer cures. In any event the *Beauharnais* case does not suggest that denial of an injunction in a case anything like this one is unnecessary for the protection of free speech. This case is not within the recognized exceptions to the application of the constitu-

tional rule. There are no words that have the effect of force as "verbal acts" (*Schenck* v. *United States,* 249 U. S. 47, 52; *Gompers* v. *Bucks Stove & Range Co.* 221 U. S. 418, 439). There is no question of protecting the lewd, obscene or the profane or the merely libellous (see *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572; *Near* v. *Minnesota,* 283 U. S. 697, 716).

In Restatement: Torts, § 942 (pages 719–720), the authors say, "In cases of torts perpetrated by means of spoken or written words, the public interest in the freedom of speech frequently comes into conflict with the public interest in the prevention of tortious harms. Adjustments of this conflict must be made as best they can, in the light of the circumstances of each case, and in the light of the basic policies underlying each public interest. Sometimes the public interest in the freedom of speech prevails. For example, the public's concern with matters affecting health justifies denial of injunctive restraint of a newspaper's expose of the supposed qualities of a patent medicine." See *Willis* v. *O'Connell,* 231 Fed. 1004.

"Where an important public interest would be prejudiced, the reasons for denying an injunction may be compelling." *Godard* v. *Babson-Dow Manuf. Co.* 313 Mass. 280, 288. *Harrisonville* v. *W. S. Dickey Clay Manuf. Co.* 289 U. S. 334, 338 (citing *Near* v. *Minnesota,* 283 U. S. 697, 719).

The constitutional protections are clear and controlling, but were they absent, the weight, in the balance, of the public interest in the discussion of cancer cures would be sufficient basis here for the denial of an injunction.

*Interlocutory decree affirmed.*
*Final decree affirmed with costs of*
*the appeal.*