441 F.2d 1396
 James W. ROBINSON, Tavner Dunlap, Jr., John A. Baker,
William Balden, Glenn H. McCauley, R. C. Gray, George Lamb,
Kemp Thompson, Suing in Behalf of Themselves Individually
and in Behalf of All Tobacco Growers Who Are Citizens and
Residents of the State of Kentucky, Plaintiffs-Appellants,
v.
AMERICAN BROADCASTING COMPANIES, Inc., a Corporation,
Columbia Broadcasting System, Inc., a Corporation,
and National Broadcasting Company, Inc.,
a Corporation, Defendants-Appellees.
 No. 20653.
 United States Court of Appeals, Sixth Circuit.
 April 30, 1971.
 
 Gladney Harville, Lexington, Ky., for appellants; Robert M. Odear, Stoll, Keenon & Park, Lexington, Ky., on brief.
 Marshall H. Cox, Jr., New York City, for appellees; Rufus Lisle, Harbison, Kessinger, Lisle & Bush, Lexington, Ky., on brief for defendants, American Broadcasting Companies, Inc., National Broadcasting Co., Inc.; William B. Gess, Stanley M. Saunier, Jr., Gess, Mattingly, Saunier & Atchison, Lexington, Ky., on brief for defendant, Columbia Broadcasting System, Inc.; Bergson, Borkland, Margolis & Adler, Washington, D.C., of counsel for American Broadcasting Companies, Inc.; Wilmer, Cutler & Pickering, Washington, D.C., of counsel for Columbia Broadcasting System, Inc.; Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, of counsel for National Broadcasting Co., Inc.
 Before PHILLIPS, Chief Judge, and WEICK and EDWARDS, Circuit Judges.
 PHILLIPS, Chief Judge.
 
 
 1
 This appeal is from a judgment dismissing the complaint in a suit filed as a class action by eight Kentucky tobacco growers. The complaint sought to enjoin broadcasting by the defendant television network companies of 'messages by television which in words or substance state either directly, indirectly or by innuendo that cigarettes will kill people who smoke them.' (Referred to herein as 'anti-smoke commercials.') No effort is made by plaintiffs to enjoin broadcasts of messages which are limited in scope to the idea that cigarette smoking may be hazardous to one's health. We affirm the order dismissing the complaint.
 
 
 2
 Plaintiffs are all residents of, and grow tobacco in, the Commonwealth of Kentucky. They claim to represent the class consisting of all persons who are tobacco growers in the state of Kentucky and who are citizens and residents of the state of kentucky.
 
 
 3
 Defendants are the three major national television network companies. Each owns, directly or through a subsidiary, five VHF television stations which it operates under licenses granted by the Federal Communications Commission (FCC), and each also operates a national television network which provides programs for broadcast by television stations owned by others.
 
 
 4
 Plaintiffs allege that the anti-smoke commercials are broadcast in complete disregard for their truth or falsity. They contend that 'there is no scientific evidence of any causal connection between cigarette smoking and lung cancer, heart disease, tuberculosis and bronchial or respiratory disorders * * *.' It is asserted that, as a direct consequence of these broadcasts, plaintiffs are irreparably injured in their business and property. Their argument runs as follows: the anti-smoke commercials are achieving the intended results. As a consequence, the demand for cigarettes and the tobacco used in their production has declined. These facts in turn have resulted in the irreparable injury of which plaintiffs complain in the form of reduced price and quantity of tobacco sold from their crops, and the attending diminution in the value of the land on which these crops are raised.
 
 
 5
 The District Court, in an opinion dismissing the complaint, held that the equitable relief of an injunction was not available to plaintiffs. It considered the case to be controlled by the equitable maxim that 'he who comes into equity must come with clean hands.' The court found that the plaintiffs, through their association with cigarette advertisers, have been guilty of the inequitable conduct of failing accurately to disclose the potential dangers of cigarette smoking. The District Court held, in essence, that plaintiffs could not be granted the relief sought now because for so long they were parties to advertisements that presented only the glamorous side of cigarette smoking.
 
 
 6
 The defendant networks on this appeal offer a number of independent legal theories in support of the decision of the District Court, including:
 
 
 7
 I. The injunction sought by plaintiffs would be an impermissible prior restraint barred by the First Amendment of the Constitution of the United States;
 
 
 8
 II. To obtain the relief they seek, plaintiffs must prove both that the cigarette-health announcements at issue were false and that defendants published them with malice-- that is, either knowing them to be false or with reckless disregard of their truth or falsity-- and on the uncontroverted facts of the record below plaintiffs could not possibily meet their burden of proving malice;
 
 
 9
 III. The cigarette-health announcements at issue were broadcast by defendants, or furnished by them to others for broadcasting, in response to a lawful order of the Federal Communications Commission-- which cannot be collaterally attacked in this proceeding-- and defendants are therefore immune from liability; and
 
 
 10
 IV. The complaint fails to state a claim for relief, in that
 
 
 11
 -- Plaintiffs have no standing to challenge the cigarette-health announcements at issue since any injury to them is indirect and remote, and
 
 
 12
 -- The class of 'tobacco growers' is too large to have been defamed.
 
 
 13
 This court finds it necessary to consider only the first of these theories. Our conclusion is that the injunctive relief sought by plaintiffs is barred by the First Amendment. We do not reach the question of inequitable conduct that was the basis of the holding of the District Court.
 
 
 14
 Plaintiffs' suit essentially is an action for common law defamation. Jurisdiction is grounded on diversity of citizenship, and Kentucky law is controlling. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. However, the Kentucky law which this court is bound to apply includes the freedoms protected by the First Amendment since those freedoms are guarded by the Fourteenth Amendment from invasion by the States. Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697, and cases cited therein.
 
 
 15
 In its most recent consideration of the relation between the First Amendment and broadcasting, the Supreme Court said:
 
 
 16
 'Although broadcasting is clearly a medium affected by a First Amendment interest, United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, (68 S.Ct. 915, 933, 92 L.Ed. 1260) (1948), differences in the characteristics of news media justify differences in the First Amendment standards applied to them.' Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 386, 89 S.Ct. 1794, 1805, 23 L.Ed.2d 371.
 
 
 17
 Anticipating the approach expressed by the Court in Red Lion, the Court of Appeals for the District of Columbia, in Banzhaf v. F.C.C., 132 U.S.App.D.C. 14, 405 F.2d 1082, cert. denied, American Broadcasting Companies v. F.C.C., 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93, stated that:
 
 
 18
 'The First Amendment is unmistakably hostile to governmental controls over the content of the press, but that is not to say that it necessarily bars every regulation which in any way affects what the newspapers publish. Even if it does, there may still be a meaningful distinction between the two media justifying different treatment under the First Amendment. Unlike broadcasting, the written press includes a rich variety of outlets for expression and persuasion, including journals, pamphlets, leaflets, and circular letters, which are available to those without technical skills or deep pockets. Moreover, the broadcasting medium may be different in kind from publishing in a way which has particular relevance to the case at hand. Written messages are not communicated unless they are read, and reading requires an affirmative act. Broadcast messages, in contrast, are 'in the air.' In an age of omnipresent radio, there scarcely breathes a citizen who does not know some part of a leading cigarette jingle by heart. Similarly, an ordinary habitual television watcher can avoid these commercials only by frequently leaving the room, changing the channel, or doing some other such affirmative act. It is difficult to calculate the subliminal impact of this pervasive propaganda, which may be heard even if not listened to, but it may reasonably be thought greater than the impact of the written work.' 405 F.2d at 1100-1101.
 
 
 19
 Banzhaf upheld the right of the FCC to require anti-smoke commercials as an affirmative duty of those licensed stations that carry cigarette commercials. One of the attacks on the FCC's ruling that was before the court in Banzhaf was that the positive requirements to broadcast the anti-smoke commercials was a violation of the networks' and stations' First Amendment rights. The Court rejected that argument, holding that:
 
 
 20
 'Whatever the constitutional infirmities of other regulations of programming, we are satisfied that the cigarette ruling does not abridge the First Amendment freedoms of speech or press.' 405 F.2d at 1101.
 
 
 21
 At first blush it would seem that if it did not abridge First Amendment rights for the FCC to force the stations to broadcast the anti-smoke commercials, no abridgement would occur by forcing the stations to stop broadcasting them. However, the first consideration listed by the Banzhaf court as affecting its decision on the First Amendment question was that the 'cigarette ruling does not ban any speech.' 405 F.2d at 1101. The injunction sought in the present case would be a ban on speech. Not only would freedom of speech be 'chilled'-- it would be totally squelched by the injunction plaintiffs have requested. We conclude that although it was constitutionally permissible to require that anti-smoke commercials be broadcast, it does not follow that an injunction prohibiting the broadcast of the same commercials would likewise be constitutionally permissible.
 
 
 22
 We are in complete accord with the proposition that broadcasting is subject to different First Amendment standards as compared to the standards applied to a public speaker or the publisher of a magazine or newspaper. The latter are free from much of the control that constitutionally may be imposed over those who are licensed to commercialize the airways.
 
 
 23
 The Supreme Court has made it clear that those holding FCC licenses may face a variety of obligations in the nature of public responsibility not faced by others. For example, the Court said in Red Lion, 395 U.S. at 394, 89 S.Ct. at 1808:
 
 
 24
 'It does not violate the First Amendment to treat licensees given the privilege of using scarce radio frequencies as proxies for the entire community, obligated to give suitable time and attention to matters of great public concern. To condition the granting or renewal of licenses on a willingness to present representative community views on controversial issues is consistent with the ends and purposes of those constitutional provisions forbidding the abridgement of freedom of speech and freedom of the press. Congress need not stand idly by and permit those with licenses to ignore the problems which beset the people or to exclude from the airways anything but their own views of fundamental questions. The statute, long administrative practice, and cases are to this effect.'
 
 
 25
 One of the most significant aspects of this case is the sweeping nature of the relief requested. Plaintiffs have asked for an injunction restraining broadcasts of 'messages by television which in words or substance state either directly, or indirectly or by innuendo that cigarettes will kill people who smoke them.'[1]
 
 
 26
 The breadth of the relief sought by plaintiff would be so far reaching as to have nationwide effect. The injunction prayed for in the complaint would prohibit radio and television discussions of a controversial public issue which currently is before the nation and vitally concerns the public health.[2]
 
 
 27
 For First Amendment purposes it is not necessary for this court to determine whether the anti-smoke commercials are true or false. In Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, (75 L.Ed. 1357), defendant had been enjoined permanently from maintaining a public nuisance. The nuisance arose out of the publication and distribution of what had been found to be a 'malicious, scandalous and defamatory' newspaper. The Supreme Court, speaking through Chief Justice Hughes, looked at the substance rather than the form of the statute under which the injunction was issued. It found the statute to constitute an impermissible prior restraint, and held that the First Amendment protection of this right to publish free from prior restraint 'extends as well to the false as to the true,' 283 U.S. at 714, 51 S.Ct. at 630, and 'without regard to the question of the truth of the charges contained in the particular periodical.' Id. at 723, 51 S.Ct. at 633.
 
 
 28
 This is not to say that the rule against prior restraints is unlimited. See, Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, Times Film Corp. v. City of Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403. Although this freedom from prior restraints may not extend to television and radio with the same force as it does to newspaper publishers,[3] we have no hesitation in holding that this freedom protects defendants from the injunction requested in this case. Here we are dealing with a current, controversial public issue. Especially when discussion centers around matters of public concern or public interest, zealous protection of First Amendment rights is required. See, Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649, 656; Pauling v. News Syndicate Co., 335 F.2d 659, 671 (2d Cir.).
 
 
 29
 Our decision that defendants' right to broadcast the anti-smoke commercials is protected by the First Amendment 'does not ignore the important social values which underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation.' Rosenblatt v. Baer, 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597. However, as the Court went on to say in Rosenblatt:
 
 
 30
 'But in cases like the present, there is tension between this interest and the values nurtured by the First and Fourteenth Amendments. The thrust of New York Times, (New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686) is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in New York Times are present and the New York Times malice standards apply.' Id.
 
 
 31
 We do not think that this case requires us to consider the effect of the decision of the Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 686, on or the relation of the tests therein established to, the First Amendment rights of licensed broadcasters. We do consider, however, that the present case involves a matter in which the 'interest in public discussion (is) particularly strong,' and that the right of protection against defamation must give way to the public's right to open discussion and exchange of ideas.
 
 
 32
 We consider as highly persuasive the reasoning of the court in Krebiozen Research Foundation v. Beacon Press, 334 Mass. 86, 134 N.E.2d 1, cert. denide, 352 U.S. 848, 77 S.Ct. 65, 1 L.Ed.2d 58. There plaintiffs, manufacturers of Krebiozen, sought to enjoin publication of a book about the alleged cancer cure on the ground that the book falsely suggested that Krebiozen was not an efficacious drug and had been marketed without adequate scientific research and through the use of misleading testimonials. They alleged that publication of the book would irreparably injure both the trade name of their product and their own reputations.
 
 
 33
 On review, the court concluded that the trial court had properly denied the injunction on constitutional grounds and in view of the important public interest in permitting publication of defendants' book.
 
 
 34
 'The plaintiffs urge that there is no protection for dissemination of what is admittedly false and they stress the rule that, to test the bill, the demurrer in a sense admits its allegations. The plaintiffs ask, 'Is an attack on efficacy and existence of a drug, the therapeutic merits of which are still under investigation * * * of such overriding public interest that the * * * (plaintiffs) should be powerless to stop defamatory statements concerning themselves and the drug?' We think the answer is 'Yes.'
 
 
 35
 'The establishment of the truth about Krebiozen as soon as possible is critically important to the public. If it is a cure it will be one of the great discoveries of modern times; if it is of value in some cases only the limitations are important; if it is of no value lives may be saved and suffering avoided by the establishment of the fact * * *. It is axiomatic in our society that full information and free discussion are important in the search for wise decisions and best courses of action. * * *
 
 
 36
 'This case under the Constitution of the United States is substantially controlled by Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357. * * * It is true, as the plaintiffs point out, that that case is stronger in that the statute there if applied would suppress future editions of the newspaper, but the grounds stated by the court are applicable to what would be done by injunction here. Much is made in that case of the importance of free discussion of office holders and of political matters. But we think that the discussion of a possible or alleged cure of one of the great scourges of mankind is substantially of the same rank as a matter for public discussion. The words of Chief Justice Hughes, 283 U.S. at page 721, 51 S.Ct. 625, are apt which show that allowing prior restraint, provided only a judge is convinced of the falsity of the proposed publication, amounts to unconstitutional censorship.
 
 
 37
 'The constitutional protections are clear and controlling, but were they absent, the weight, in the balance, of the public interest in the discussion of cancer cures would be sufficient basis here for the denial of an injunction.' 134 N.E.2d at 6-9
 
 
 38
 If discussion of an alleged cure for cancer was sufficiently important for the court in Krebiozen to deny an injunction, even assuming falsity, we conclude that discussion of an alleged possible cause of lung cancer is of equal magnitude.
 
 
 39
 For the Commonwealth of Kentucky to grant the relief sought by plaintiffs in this case would be a violation of the First Amendment. We hold that the District Court likewise was precluded from issuing the injunction sought by plaintiffs.
 
 
 40
 Affirmed.
 
 
 
 [1]
 The broad sweep of the requested relief is emphasized when consideration is given to some of the more traditional ways in which plaintiffs could have sought redress for their alleged injury. Some of these avenues of attack include:
 
 
 [1]
 An attack on the basis of the ruling by the FCC requiring that the antismoke commercials be broadcast;
 
 
 [2]
 A request to the FCC that its ruling be withdrawn in view of the recent ban by Congress (15 U.S.C. 1335) on all cigarette commercials over radio and television;
 
 
 [3]
 A request for equal time under the Fairness Doctrine to present the view that cigarette smoking does not kill people who smoke them;
 
 
 [4]
 A suit requesting an injunction against future broadcasts of a specific anti-smoke commercial
 A thorough discussion of several of these and many other pertinent factors can be found in the December 15, 1970, Report and Order of the FCC (20 R.R.2d 1669) which is directed to the obligation of broadcast licensees to carry smoking and health messages after January 1, 1971.
 
 
 [2]
 Plaintiffs stipulated that:
 'The Surgeon General's reports relating to smoking and health and proposed regulations of cigarette advertising have been widely reported to the press and over radio and television and have been and are the subject of widespread public discussion.'
 The record shows that virtually all the anti-smoke commercials are supplied to defendants by the United States Public Health Service, the American Cancer Society, the American Heart Association, and the National Tuberculosis and Respiratory Disease Association. None of the defendants receives any payment for broadcasting these announcements over its owned television stations or for transmitting them over its network for broadcast by television stations owned by others.
 
 
 [3]
 See, 39 U.S.L.W. 2514, reporting the recent FCC announcement that radio station licensees must screen records to ascertain whether songs contain 'drug lyrics' that tend to promote or glorify use of illegal drugs, and, if so, whether the public interest responsibility of the station requires that the song not be played as a part of the station's programming. Whether this requirement can withstand an attack based on 47 U.S.C. 326 (which denies the FCC any censorship powers) and the First Amendment remains yet to be decided