## THE FIRST NATIONAL BANK OF BOSTON & others *vs.* ATTORNEY GENERAL.

Suffolk.    October 2, 1972. — November 9, 1972.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Statute,* Construction. *Elections.  Corporation,* Political contribution, Constitutional protection.  *Taxation,* Income tax.  *Constitutional Law,* Political contributions, Elections, Freedom of speech and press.  *Words,* "Persons."

In a suit in equity by certain corporations engaged in general business, it was ordered by this court that G. L. c. 55, § 7, as amended through St. 1972, c. 458, was not effective to prohibit the plaintiffs from making expenditures for publicity for the purpose of affecting the vote on a referendum question as to the adoption of a constitutional amendment authorizing the Legislature to enact a graduated income tax applicable to both individuals and corporations. [571–572]

Properly construed, the sentence added to G. L. c. 55, § 7, by St. 1972, c. 458, totally prohibits expenditures by corporations for publicity for the purpose of affecting the vote on a referendum question as to the adoption of a constitutional amendment authorizing the Legislature to enact a graduated income tax applicable to both individuals and corporations, even though in fact such a constitutional

amendment would materially affect the property, business or assets of corporations. Per TAURO, C.J., and REARDON, J. [576–577]; properly construed, the 1972 amendment of c. 55, § 7, does not prohibit such expenditures by corporations wih respect to such a referendum question. Per QUIRICO, BRAUCHER, and KAPLAN, JJ. [593–594]

Discussions of the proper construction of a statute in relation to the question of its constitutionality. [577–581]

Corporations, such as banks and insurance companies, engaged in general business, as distinguished from the business of communication, are entitled to the protection of the freedom of speech and press clause of the First Amendment of the Federal Constitution, applicable to the States through the due process clause of the Fourteenth Amendment, and art. 16 of the Declaration of Rights of the Massachusetts Constitution, as amended by art. 77 of the Amendments, in seeking to express their views to the public with respect to referenda issues materially affecting them. Per TAURO, C.J., and REARDON, J. [582–586]

The sentence added to G. L. c. 55, § 7, by St. 1972, c. 458, as applied to corporations attacking its validity as plaintiffs in a suit in equity and as interpreted as totally prohibiting expenditures by the plaintiffs for publicity for the purpose of affecting the vote on a referendum question as to the adoption of a constitutional amendment authorizing the Legislature to enact a graduated income tax, applicable to corporations as well as individuals and materially affecting the plaintiffs' interests, is, absent any showing that the expression of the plaintiffs' views would exert undue influence on the vote, in excess of the Legislature's power to regulate elections and is violative of the plaintiffs' right of expression under the First Amendment of the Federal Constitution, applicable to the States by the due process clause of the Fourteenth Amendment, and art. 16 of the Declaration of Rights of the Massachusetts Constitution, as amended by art. 77 of the Amendments. Per TAURO, C.J., and REARDON, J. [589–591]


BILL IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on August 4, 1972.

The suit was reserved and reported by *Reardon*, J., without decision.

*Francis H. Fox* for the plaintiffs.

*Timothy F. O'Leary*, Assistant Attorney General, for the Attorney General.


On October 13, 1972, the following order was issued by the court:


"WHEREAS this matter is before us on the reservation and report of the single justice; and

"WHEREAS a prompt resolution of the questions presented is required; and

"WHEREAS time does not allow that the opinion in the matter be prepared and filed at this time in view of the exigencies of the situation; and

"WHEREAS said opinion will be filed in the near future;

"NOW, THEREFORE, be it ORDERED that

"General Laws c. 55, § 7, as amended through St. 1972, c. 458, is not effective to prohibit the plaintiffs from making the proposed expenditures which are in issue in this case."

OPINION OF TAURO, C.J. (Reardon, J., concurring) The plaintiffs [1] in their bill for declaratory relief allege that they intend to expend moneys, for newspaper advertisements and similar publicity, in an effort to persuade the voters of Massachusetts to defeat the proposed constitutional amendment to be submitted to the voters in a referendum question at the general election on November 7, 1972. [2] The proposed amendment would grant the General Court the authority to enact a graduated income tax. The bill further alleges that under the 1972 amendment to G. L. c. 55, § 7 ("political contributions" statute),

---

[1] The plaintiffs are The First National Bank of Boston (First National); New England Merchants National Bank of Boston (Merchants); John Hancock Mutual Life Insurance Company (John Hancock); Wyman-Gordon Company (Wyman-Gordon).

[2] "Article of Amendment. Art. . The general court shall have full power and authority to impose and levy a tax on incomes at rates which are proportioned or graduated according to the total amount of income received and to grant reasonable exemptions, deductions and abatements, as an alternative to the exercise of the power and authority to impose and levy a tax on incomes in the manner provided in Article XLIV of the Amendments of the Constitution of the Commonwealth. Notwithstanding any other provision of this Constitution, and without limiting the generality of the foregoing, such tax may be imposed and levied by the application of a uniform rate to the individual income tax liability as determined under the laws of the United States or by the application of graduated rates to the total individual income taxable under the laws of the United States. In either case, the general court may define the tax liability or the total income upon which such tax is imposed or levied and the graduated rates at which it is taxed by reference to any provision of the laws of the United States as the same may be or become effective at any time or from time to time, and may prescribe reasonable exceptions to and modifications of such provisions."

they are forbidden to expend moneys for any such purpose.[3] The defendant, the Attorney General of the Commonwealth, has stated that if the plaintiffs expend any such sums he would prosecute them under the said statute. The plaintiffs allege that the statute, in its present amended form, is unconstitutional on its face and as applied to them, and seek a declaration to that effect.

The case is submitted to us on the pleadings and on a statement of agreed facts and we will consider the case on this record as a case stated.

The plaintiffs [4] can be described briefly as follows: The

[3] By adding one sentence (italicized *infra*) the Legislature amended G. L. c. 55, § 7, by St. 1972, c. 458, effective June 20, 1972. "No corporation carrying on the business of a bank, trust, surety, indemnity, safe deposit, insurance, railway, street railway, telegraph, telephone, gas, electric light, heat, power, canal, aqueduct, or water company, no company having the right to take land by eminent domain or to exercise franchises in public ways, granted by the commonwealth or by any county, city or town, no trustee or trustees owning or holding the majority of the stock of such a corporation, no business corporation incorporated under the laws of or doing business in the commonwealth and no officer or agent acting in behalf of any corporation mentioned in this section, shall directly or indirectly give, pay, expend or contribute, or promise to give, pay, expend or contribute, any money or other valuable thing for the purpose of aiding, promoting or preventing the nomination or election of any person to public office, or aiding, promoting or antagonizing the interests of any political party, or influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation. *No question submitted to the voters concerning the taxation of the income, property or transactions of individuals shall be deemed materially to affect the property, business or assets of the corporation.* No person or persons, no political committee, and no person acting under the authority of a political committee, or in its behalf, shall solicit or receive from such corporation or such holders of stock any gift, payment, expenditure, contribution or promise to give, pay, expend or contribute for any such purpose.

"Any corporation violating any provision of this section shall be punished by a fine of not more than ten thousand dollars, and any officer, director or agent of a corporation violating any provision thereof or authorizing such violation, or any person who violates or in any way knowingly aids or abets the violation of any provision thereof, shall be punished by a fine of not more than five thousand dollars or by imprisonment for not more than six months."

[4] First National is a national bank organized under the laws of the United States with an usual place of business in Boston; Merchants is a national bank organized under the laws of the United States with an usual place of business in Boston; John Hancock is a mutual life insurance company organized under the laws of Massachusetts with an usual place of business in Boston; Wyman-Gordon is a corporation organized under the laws of Massachusetts with an usual place of business in Worcester.

plaintiff banks are engaged in the county of Suffolk in the business of retail, commercial and other forms of banking activities. These include, but are not limited to, maintaining savings and checking accounts for the benefit of both individual and corporate depositors, making loans to individuals and corporations, acting as trustee for the benefit of beneficiaries designated by their customers, acting as transfer agent for certain publicly held corporations and performing other services normally associated with the banking business. John Hancock is a mutual life insurance company engaged principally in life insurance underwriting. Many of its policyholders are residents of Massachusetts. A portion of John Hancock's assets are invested in real estate located within the Commonwealth of Massachusetts. In order to conduct its business John Hancock relies on the services of a group of high level management personnel. John Hancock employs 9,618 persons in Massachusetts. Wyman-Gordon is a business corporation engaged in the business of die forging, utilizing highly sophisticated metal forming techniques. Wyman-Gordon principally serves the aircraft and automotive industries. It has plants in Worcester, Grafton and Millbury, Massachusetts, and employs approximately 2,500 persons in Massachusetts. The plaintiffs believe that because of their far reaching business relationships within Massachusetts, the proposed constitutional amendment, if enacted, would materially affect their business interests.

I. *Are Plaintiff Corporations Materially Affected by the Proposed Constitutional Amendment?*

Prior to its 1972 amendment, G. L. c. 55, § 7, did not prohibit a corporation from expending or contributing "any money or other valuable thing for the purpose of . . . affecting the vote on any question submitted to the voters" provided the question materially affected the property, business or assets of the corporation. In *Lustwerk* v. *Lytron, Inc.* 344 Mass. 647, 653, we held that a

question to be submitted to the voters at a State election, proposing a constitutional amendment granting the Legislature the power to impose a graduated income tax on either corporations or individuals, was a question materially affecting the property, business or assets of a Massachusetts business corporation. Expenditures by such a corporation for the purpose of influencing the voters on that proposed constitutional amendment were not, therefore, prohibited by c. 55, § 7.

The effect of the language of the proposed constitutional amendment in the *Lustwerk* case, *supra*,[5] is very similar to that of the language of the constitutional amendment to be put to the voters on November 7, 1972.[6] The proposed consitutional amendment would authorize the Legislature to impose a graduated tax on individuals and corporations.[7] The plaintiffs contend that the potential power to impose a graduated income tax on corporations and individuals would materially affect their business and property. They maintain that such a power if enacted would discourage executives from settling or remaining in the State, alter the plaintiffs' wage and

---

[5] In the *Lustwerk* case it was stipulated that the following proposed constitutional amendment had been approved in two successive sessions (1959 and 1961) of the Legislature in joint sessions and would be submitted to the voters on the ballot at the election in November, 1962: "Article ———. Full power and authority are hereby given and granted to the general court, in the alternative to the exercise of the power and authority to impose and levy a tax on incomes in the manner provided in Article XLIV of the amendments to the Constitution of the Commonwealth, to impose and lexy a tax on incomes at rates which are proportioned or graduated according to the amount of income received, irrespective of the source from which it may be derived, and to grant reasonable exemptions, deductions and abatements. Any property the income from which is taxed under the provisions of this article may be exempted from the imposition and levying of proportional and reasonable assessments, rates and taxes as at present authorized by the constitution. This article shall not be construed to limit the power of the general court to impose and levy reasonable duties and excises." 344 Mass. at 648, n. 1.

[6] For full text of the amendment, see n. 2, *supra*.

[7] The Legislature may already have the power to impose a graduated corporate excise tax on the basis of income. In *Lustwerk* v. *Lytron, Inc.*, *supra*, at 651, we held, however, that "The proposed constitutional amendment [see n. 5, *supra*] if adopted, in various respects, will give to the Legislature a substantially broader power than now exists to impose income taxes upon corporations . . . within Massachusetts."

compensation structures, shrink total bank deposits and cause a great decline in the State's economic climate to the detriment of the plaintiffs' own business. Whether or not all of the plaintiffs' predictions concerning the future effects of the imposition of such taxes are accurate is not decisive. Indeed it may be that the Legislature will never exercise such power even if granted by the people. However, it is reasonable to conclude on the record before us that the proposed amendment, like its predecessor in the *Lustwerk* case, *supra*, at 651, materially affects the property, business or assets of the plaintiff corporations and thus the plaintiffs have reasonable justification for believing that the amendment would so affect them.

II. *What was the Legislature's Intent in Enacting the 1972 Statutory Amendment to G. L. c. 55, § 7?*

The rationale of the *Lustwerk* decision, *supra*, would have left the plaintiffs in the instant case free to publicize their views upon the proposed constitutional amendment. On June 20, 1972, however, the Legislature amended c. 55, § 7, by inserting, after the first sentence of § 7, the following sentence: "No question submitted to the voters concerning the taxation of the income, property or transactions of individuals shall be deemed materially to affect the property, business or assets of the corporation." [8]

On its face, it would appear that the Legislature intended this statutory amendment to apply to any referendum question "concerning" taxes on individuals, regardless of whether the precise question put to the voters also concerns the taxation of other entities. Since the proposed constitutional amendment is obviously a question "concerning the taxation .of the income . . . of individuals," this interpretation of the Legislature's intent in my view requires us to reach the constitutional questions raised by the plaintiffs. This conclusion is

---

[8] See n. 3, *supra*.

based on the premise that the 1972 statutory amendment would prevent the plaintiffs from expressing their views to the public about the November 7 referendum question.

However, Justice Quirico suggests in his concurring opinion (joined by Braucher, J. and Kaplan, J.) that the Legislature intended its 1972 statutory amendment to apply only to referendum questions which *solely* concern the taxation of individuals. This interpretation of legislative intent leaves the plaintiffs free to expend moneys on the referendum question submitted to the voters on November 7 because that question does not *solely* concern taxes on individuals.

The strongest reason to accept such a construction is the constitutional rule of adjudication which obligates courts in construing legislative enactments "to take care to interpret them so as to avoid a danger of unconstitutionality." *United States* v. *Congress of Industrial Organizations,* 335 U. S. 106, 120–121. The United States Supreme Court has adopted this approach to avoid ruling on the constitutionality of the Federal Corrupt Practices Act.[9]  On three separate occasions in the last twenty-five years, the Supreme Court has been asked to decide the constitutionality of that act. On all three occasions, it has avoided reaching the constitutional quesions by narrow and sometimes strained statutory construction. *United States* v. *Congress of Industrial Organizations,* 335 U. S. 106. *United States* v. *International Union United Auto., Aircraft & Agricultural Implement Wkrs. of Am. (UAW–CIO),* 352 U. S. 567, *Pipefitters Local Union No. 562* v. *United States,* 407 U. S. 385. Justice Frankfurter used this doctrine of judicial self-restraint to support the court's decision in *United States* v. *Congress of Industrial Organizations,*

---

[9] The provision originally challenged in *United States* v. *Congress of Industrial Organizations,* 335 U. S. 106, was § 313 of the Corrupt Practices Act, 1925. This act was amended by § 304 of the Labor Management Relations Act, 1947. Section 313 was the predecessor of 18 U. S. C. § 610 (1970). Section 610 was the provision challenged in *United States* v. *International Union United Auto., Aircraft & Agricultural Implement Wkrs. of Am. (UAW–CIO),* 352 U. S. 567, and *Pipefitters Local Union No. 562* v. *United States,* 407 U. S. 385.

*supra.* He relied chiefly on Chief Justice Marshall's observation that " '[n]o questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them; but if the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.' " Quoted at 335 U. S. 125, from *Ex parte Randolph*, 20 Fed. Cas. No. 11, 558 at 254, 2 Brock. 447, 478–479 (C. C. D. Va. 1833).

However, the United States Supreme Court has also acknowledged that the avoidance of constitutional questions is discretionary and should be used only in the proper circumstances. See *Clay* v. *Sun Ins. Office Ltd.* 363 U. S. 207. It would be an abnegation of our judicial responsibility to give an unreasonable statutory construction of this 1972 amendment merely to avoid reaching difficult constitutional questions. Thus, the question we must answer before invoking the doctrine of judicial self-restraint is whether this statutory amendment is reasonably susceptible of two interpretations. See *Knights Templars' & Masons' Life Indem. Co.* v. *Jarman*, 187 U. S. 197, 205. Is the construction which, in effect, reads the word "solely" into the statutory language to make the amendment apply *only* to referendum questions pertaining to taxes on individuals a reasonable one? An analysis of the Legislature's intent in passing this amendment clearly indicates that such a construction is unreasonable.

The Legislature's intent in passing this statutory amendment was to prevent any corporation from trying to affect the vote on the referendum question which will be submitted to the voters on November 7, 1972. Realizing that the *Lustwerk* case would allow corporations to address the voters on questions which concerned *both* corporate and individual taxation, the Legislature declared the 1972 statutory amendment to be an emergency law which would be immediately enforceable because

"[t]he deferred operation of this act would tend to defeat its purpose, which is to further regulate those questions submitted to the voters upon which certain corporations may influence or affect the vote." St. 1972, c. 458. Obviously, if the Legislature had intended this amendment to apply to questions *solely* concerning taxation of individuals, there would have been no reason to declare the amendment an emergency law because the November 7 referendum question concerns *both* the power to tax individuals and other legal entities on a graduated basis.[10]

We have stated repeatedly that a construction of a statute which would completely negate legislative intent is to be avoided. *Assessors of Newton* v. *Pickwick Ltd. Inc.* 351 Mass. 621. A statutory construction which limits the 1972 amendment's application to questions solely involving individual taxation has exactly this effect. The use of the word "concerning" instead of "solely concerning" reflects the Legislature's intent to have the amendment apply to referenda questions which include other matters beyond the taxation of individuals.[11] Limiting the 1972 statutory amendment's effect by interpreting it to apply to questions solely concerning individual taxes constitutes an impermissible judicial redrafting of the statute which invades the Legislature's prerogative.[12] Such a construction also produces the

---

[10] It may be suggested that the Legislature could have mistakenly believed that the November 7 referendum question concerned only the power to tax individuals. In light of our holding in the *Lustwerk* case and the clear language of the November 7 referendum question, it is unfair to impugn the Legislature with such naïvete and ineptness. Nowhere in the record is there any evidence which suggests that the Legislature did not realize that the November 7 ballot question involved corporate, as well as individual taxing powers: rather the contrary seems to be indicated.

[11] It is of much significance that all parties to this controversy agree that the Legislature's intent was to prohibit corporations from trying to affect the vote on any question which concerns the taxation of individuals, regardless of whether the precise question put to the voters also concerns the taxation of other entities. The Attorney General concedes in his brief that "[i]f the Legislature had intended to limit St. 1972, c. 458, to questions concerning *only* the taxation of the income, property or transactions of individuals, it would have so stated."

[12] In an attempt to avoid a constitutional question clearly and squarely presented by the 1972 amendment, Justice Quirico's concur-

absurd result of an emergency resolution which has no impact on the very referendum question it was designed

ring opinion (joined in by Braucher, J. and Kaplan, J.) concludes that "[t]he 1972 preclusion of corporate authority to expend money on questions having only such an *indirect effect* on their property, business or assets did not in any way, or to any extent or degree, either repeal or diminish the corporate right, recognized in another portion of the statute, to expend money to influence the vote of the people on questions which might directly affect the corporate property, business or assets" (emphasis supplied).

It is obvious, however, that this conclusion begs the essential question of whether the Legislature can silence corporations from speaking out on a ballot question concerning individual taxation. Justice Quirico does this by creating an artificial direct versus indirect effect test which bears no relationship to the actual language of G. L. c. 55, § 7. The concurring opinion notes, "In my opinion the right of the plaintiff corporations . . . does not derive from or depend on this alleged *indirect effect* . . . [of] a graduated income tax on individuals . . . but rather it exists by virtue of the *direct effect* which a graduated income tax on corporations might have thereon" (emphasis supplied). However, the express language of the statute speaks in terms of questions that *materially affect* the corporations' business, property, or assets. Obviously, economic measures directly concerning individuals may have serious "indirect" effects on the economic climate of the State and thereby *materially* affect corporations. Labeling the effect "indirect" does not resolve the question of whether it materially affects corporations. Here it is important to note that the concurring opinion recites only a small portion of the plaintiff's complaints as to the manner in which a graduated income tax on *individuals* would materially affect their corporate interests.

The circular logic involved in the concurring opinion is revealed by the relief it grants the plantiff corporations. Although the concurring opinion admits that the Legislature intended only to prevent corporations from speaking out on the individual taxation question involved in the November 7 referendum, its ruling allows them to do so. Despite its reasoning that the corporation's right to speak out is derived *solely* from the direct effect of a possible corporate graduated income tax, under the ruling of the concurring opinion corporations are free to advertise their views on the *individual* taxation issue without any mention of their views on the corporate taxation question — the very result the Legislature was trying to prevent by its passage of the 1972 statutory amendment as an emergency resolution.

Thus, the concurring opinion by begging the essential question at issue produces the unusual result of allowing corporations to speak out on individual taxation questions despite the legislative intent to the contrary and the concurring opinion's own conclusion that the corporation's right to speak out exists "by virtue of the direct effect . . . [of] a graduated income tax on corporations."

Recently we said, " 'A construction of . . . [a statute] that would lead to an absurd and unreasonable conclusion is not to be adopted where its language is fairly susceptible to a construction that would lead to a logical and sensible result.' *Bell* v. *Treasurer of Cambridge,* 310 Mass. 484, 489." *McCarthy* v. *Woburn Housing Authy.* 341 Mass. 539, 542. By its enactment of the 1972 statutory amendment, the Legislature has posed for this court an intelligible constitutional issue of great importance. In my view, rather than avoid it, we should meet this issue squarely and decisively.

to affect by its immediate enactment. This court has repeatedly stated that it will not attribute to the Legislature an intention to accomplish an absurd result unless clearly required to do so by the language of the statute. *Johnson* v. *Commissioner of Pub. Safety*, 355 Mass. 94, 99. Certainly, the language of this statutory amendment does not compel such an absurd result.

Judicial self-restraint in reaching constitutional attacks on legislative amendments and judicial rules of statutory construction are both predicated on our desire to respect the Legislature's special prerogative in enacting legislation. I feel that the purposes underlying both these doctrines will be ill served by a ruling which avoids reaching a constitutional question by giving a strained and unreasonable construction of the statute which negates its clear intent. Therefore, I conclude that the clear intent of the 1972 statutory amendment was to negate the effect of the *Lustwerk* case, *supra*, and to reimpose a total prohibition on corporate expenditures used to influence the vote on referendum questions that concern the imposition of a graduated tax on individuals, regardless of whether the question also concerns the taxation of the incomes of other entities. Thus, the plaintiffs' intended expenditures on the proposed constitutional amendment are prohibited by the 1972 statutory amendment.

III. *Is the Plaintiffs' Expression of their Views on the Proposed Constitutional Amendment Protected by the First Amendment to the United States Constitution?*

Since corporations must usually expend moneys to communicate their views, the 1972 statutory amendment's prohibition effectively prevents the plaintiffs from expressing their views to the electorate on the proposed referendum. The plaintiffs contend, therefore, that the 1972 statutory amendment as applied to them and on its face violates the First Amendment to the United States

Constitution [13] and arts. 16 [14] and 19 [15] of the Declaration of Rights of the Massachusetts Constitution.

The Attorney General argues that the plaintiffs, because they are artificial legal entities, are not protected by the First Amendment as applied to the States through the Fourteenth Amendment. The United States Supreme Court has, however, held that although corporations are not "citizens" within the privileges and immunities clause of § 1 of the Fourteenth Amendment, *Orient Ins. Co.* v. *Daggs,* 172 U. S. 557, 561 (see *Waters-Pierce Oil Co.* v. *Texas,* 177 U. S. 28, 45; *Hemphill* v. *Orloff,* 277 U. S. 537), they are "persons" within the meaning of the due process clause of § 1 of the Fourteenth Amendment. See, generally, *Covington & Lexington Turnpike Rd. Co.* v. *Sandford,* 164 U. S. 578, 592; *Smyth* v. *Ames,* 169 U. S. 466, 522.

The Attorney General relies on some Supreme Court and Federal cases which seem to indicate that artificial persons such as corporations are not specifically protected by the liberty clause of the Fourteenth Amendment, even though they are "persons" protected by the property clause of the due process provisions. [16] See, e.g., *Northwestern Natl. Life Ins. Co.* v. *Riggs,* 203 U. S. 243, 255; *Western Turf Assn.* v. *Greenberg,* 204 U. S. 359, 363; *Hague* v. *Committee for Industrial Organization,* 307 U. S. 496, 527 (opinion of Mr. Justice Stone) ; *Hallmark*

---

[13] The First Amendment to the United States Constitution has been held applicable to the States through the Fourteenth Amendment. See, e.g., *Gitlow* v. *New York,* 268 U. S. 652, 666; *Grosjean* v. *American Press Co. Inc.* 297 U. S. 233, 244.

[14] Massachusetts Declaration of Rights, art. 16, as amended by art. 77 of the Amendments: "The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged."

[15] Massachusetts Declaration of Rights, art. 19: "The people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer."

[16] United States Constitution, Amendment 14, § 1, provides in part: ". . . nor shall any state deprive any person of life, liberty, or property, without due process of law . . . ."

*Prod. Inc.* v. *Mosley*, 190 F. 2d 904, 909 (8th Cir.). The Attorney General concludes from these cases that since a corporation cannot claim protection under the term "liberty" in the due process clause, a corporation cannot claim a right to freedom of expression, because that is a liberty protected by the First Amendment, not a property right. We cannot agree.

The Supreme Court has channeled First Amendment liberties through the Fourteenth Amendment to protect some corporations. In *Grosjean* v. *American Press Co. Inc.* 297 U. S. 233, 244, the court stated: "That freedom of speech and of the press are rights of . . . fundamental character, safeguarded by the due process of law clause of the Fourteenth Amendment against abridgement by state legislation, has likewise been settled by a series of decisions of this Court beginning with *Gitlow* v. *New York*, 268 U. S. 652, 666, and ending with *Near* v. *Minnesota*, 283 U. S. 697, 707. . . . Appellant contends that the Fourteenth Amendment does not apply to corporations; but this is only partly true. A corporation, we have held, is not a 'citizen' within the meaning of the privileges and immunities clause. *Paul* v. *Virginia*, 8 Wall. 168. But a corporation is a 'person' within the meaning of the equal protection and due process of law clauses, which are the clauses involved here."

We have also afforded certain corporations First Amendment protection. *Brattle Films, Inc.* v. *Commissioner of Pub. Safety*, 333 Mass. 58. *Krebiozen Research Foundation* v. *Beacon Press, Inc.* 334 Mass. 86. In the past we have spoken broadly of the liberty of the press to be afforded corporations. In *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, we addressed ourselves to the question whether a labor union enjoys the same liberty of the press as individuals. The case was decided under arts. 16 and 19 of the Massachusetts Declaration of Rights but the freedoms in question were held comparable to First Amendment freedoms. We said, "The liberty of the press is enjoyed, not only by individuals, but also by associations of individuals such as labor

unions (*Hague* v. *Committee for Industrial Organization*, 307 U. S. 496), *and even by corporations*, although a corporation is not a 'citizen' and must find its protection against abridgement of its liberty by State action in the due process clause . . . of the Fourteenth Amendment" (emphasis supplied).[17] The *Bowe* case, *supra*, at 251.

The Attorney General correctly points out that in those cases where corporations have been afforded First Amendment protection they have been engaged in the business of communication, such as the publication and distribution of newspapers, books, films and magazines. *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495. *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 266. But we believe that freedom of speech and freedom of the press in their application to corporate entities cannot be so strictly limited. Moreover, the United States Supreme Court has indicated that the prospect of profit gained from a corporation's communication will not oust that communication from First Amendment protection: "It is urged that motion pictures do not fall within the First Amendment's aegis because their production, distribution, and exhibition is a large-scale business conducted for private profit. We cannot agree. That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." *Joseph Burstyn, Inc.* v. *Wilson*, *supra*, 501–502. The mere fact that views on referenda issues materially affecting the plaintiffs' business emanate from corporations engaged in general commercial pursuits (as opposed to corporations in the business of communications) should not totally preclude the expression of these views.

---

[17] But cf. *Ramsey* v. *Tacoma Land Co.* 196 U. S. 360, where it was held that a State corporation is a citizen entitled to the benefit of § 5 of the Act of 1887 which names as beneficiaries citizens of the United States conferring upon such citizens who are purchasers from a railway company of land excepted from its grant, the right to purchase same from the government.

It is true, of course, that there is a distinction between the plaintiffs' business pursuits and pursuits of corporations in the business of communication. But we believe that it is a distinction that does not defeat the plaintiffs' right to First Amendment protection, at least in circumstances where they seek to express their views to the public on referenda issues that materially affect them. We need not decide now whether in all instances a business corporation can claim the same First Amendment protection afforded individuals or corporations primarily engaged in communications.

IV. *Is the Plaintiffs' Expression of their Views on the Proposed Constitutional Amendment Protected by Art. 16 of the Massachusetts Declaration of Rights?*

The plaintiffs also claim the protection of arts. 16 and 19 of the Declaration of Rights of the Constitution of this Commonwealth. Since we find protection for the plaintiffs under art. 16, we shall not address ourselves to the type of protection offered by art. 19. Article 16 declares: "The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged." In *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230, the court had before it an initiative petition that sought to amend G. L. c. 55, § 7, to include labor unions within its scope. Although the case concerned the addition of labor unions to the statute, one of the results of the proposed legislation was declared to be: "that a corporation . . . would no longer have a right to make any political contribution for the purpose of influencing or affecting the popular vote on any question submitted to the voters even though that question might materially affect the property, business or assets of the corporation." The *Bowe* case, *supra,* at 234. The proposed law, which admittedly only directly concerned a labor union, was held inconsistent with the liberty of the press and the right of assembly under arts.

16 [18] and 19 of the Declaration of Rights and was thus excluded from the popular initiative. There is no doubt that the effect on the plaintiffs of the 1972 statutory amendment to G. L. c. 55, § 7, so far as it affects the present case, is precisely as stated in the *Bowe* case, *supra*.

In the *Bowe* case, *supra*, at 249, we said that the freedoms guaranteed to labor unions under arts. 16 and 19 were "comparable to the rights of 'freedom of speech' and 'of the press,' and the right of the people 'peaceably to assemble,' declared in the First Amendment to the Constitution of the United States, and held to be part of the 'liberty' protected by the Fourteenth Amendment against abridgment by a State without due process of law." We see no reason why such freedoms should not also be afforded to the corporations in the instant case.[19] Whether the freedom of press and expression guaranteed to corporations under the First Amendment is, in all respects, similar to the freedom guaranteed them under art. 16 of the Declaration of Rights,[20] we need not decide. In the circumstances of this case we hold that the safeguards of art. 16 apply to the plaintiffs.

V.  *Does the 1972 Statutory Amendment Exceed the Legislature's Power to Regulate Elections when First Amendment Freedoms are at Stake?*

The plaintiffs contend correctly that First Amendment protections are preferred to the extent that the usual presumption of validity that attaches to legislation is not operative when the Legislature seeks to curb free expression. See, generally, *United States* v. *Congress of Indus-*

---

[18] In 1946 when the *Bowe* case, *supra*, was decided, art. 16 of the Declaration of Rights did not expressly protect the right of free speech although free speech was held to be encompassed within the combined protections of arts. 16 and 19 of the Declaration of Rights. The *Bowe* case, *supra*, at 249. In 1948, art. 16 was amended by the addition of the sentence, "The right of free speech shall not be abridged."

[19] See *United States* v. *Congress of Industrial Organizations,* 335 U. S. 106, 154–155 (Rutledge, J., concurring).

[20] See *Krebiozen Research Foundation* v. *Beacon Press, Inc.* 334 Mass. 86, 96.

*trial Organizations,* 335 U. S. 106, 140–141 (Rutledge, J., concurring). We must resolve the question whether the language of the recent amendment to G. L. c. 55, § 7, is sufficiently narrow so that it represents a legitimate legislative purpose consistent with the State's compelling interest to guarantee free elections or whether the statutory amendment unnecessarily encroaches upon guaranteed corporate constitutional freedoms.

The Legislature has the power to regulate elections in order to prevent bribery, fraud and corruption to the end that the people's right to vote may be protected. Article 9 of the Declaration of Rights declares that "All elections ought to be free . . . ." In the *Bowe* case, *supra,* we indicated that First Amendment freedoms are subject to "reasonable regulation in the interest of the public." 320 Mass. at 250. But such regulation must be narrowly drawn to meet the precise evil sought to be curbed. *Cantwell* v. *Connecticut,* 310 U. S. 296.

In the analogous area of the Federal Corrupt Practices Act (18 U. S. C. § 610 [1970]) the Supreme Court of the United States has avoided ruling directly upon the constitutionality of the act. *United States* v. *Congress of Indusrial Organizations,* 335 U. S. 106. *United States* v. *International Union United Auto., Aircraft & Agricultural Implement Wkrs. of Am. (UAW–CIO),* 352 U. S. 567. *Pipefitters Local Union No. 562* v. *United States,* 407 U. S. 385. Some members of the court have, however, offered their views on the constitutionality of the Corrupt Practices Act [21] when applied to curb the activities of labor unions. In *United States* v. *Congress of Industrial Organizations, supra,* at 155, Justice Rutledge, in his concurring opinion in which three other Justices joined, declared: "A statute which, in the claimed interest of free and honest elections, curtails the very freedoms that make possible exercise of the franchise by an in-

---

[21] The provision actually challenged was § 313 of the Corrupt Practices Act, 1925, as amended by § 304 of the Labor Management Relations Act, 1947, the predecessor of 18 U. S. C. § 610 (1970).

formed and thinking electorate, and does this by indiscriminate blanketing of every expenditure made in connection with an election, serving as a prior restraint upon expression not in fact forbidden as well as upon what is, cannot be squared with the First Amendment."

Justice Rutledge also questioned the constitutionality of the act's prohibition on expenditures when applied to corporations, 335 U. S. 106, 154–155. His statement refutes the Attorney General's argument that the plaintiffs as artificial entities are not entitled to First Amendment protection. "There are of course important legal and economic differences remaining between corporations and unincorporated associations, including labor unions, which justify large distinctions between them in legal treatment. But to whatever extent this may be true, it does not follow that the broadside and blanketing prohibitions here attempted in restriction of freedom of expression and assembly would be valid in their corporate applications. Corporations have been held within the First Amendment's protection against restrictions upon the circulation of their media of expression. *Grosjean* v. *American Press Co. Inc.* 297 U. S. 233. It cannot therefore be taken, merely on legislative assumption, practice or judgment, that restrictions upon freedoms of expression by corporations are valid." We agree.

In *United States* v. *International Union United Auto., Aircraft & Agricultural Implement Wkrs. of Am. (UAW–CIO)*, 352 U. S. 567, 598, Justice Douglas in his dissenting opinion in which Chief Justice Warren and Justice Black joined stated: "The Act, as construed and applied, is a broadside assault on the freedom of political expression guaranteed by the First Amendment. It cannot possibly be saved by any of the facts conjured up by the Court." He recognized that the logic of his argument was not restricted to the act's application to labor unions alone. "Some may think that one group or another should not express its views in an election because it is too powerful, because it advocates unpopular ideas, or because it has a record of lawless action. But these are not justi-

fications for withholding First Amendment rights from any group — labor *or corporate*" (emphasis supplied). 352 U. S. at 597.

In *United States* v. *Congress of Industrial Organizations*, 335 U. S. 106, 121, the United States Supreme Court construed the act's prohibitions not to encompass the distribution of a union "in-house" newspaper, and noted: "If § 313 [predecessor to § 610] were construed to prohibit the publication, by corporations and unions in the regular course of conducting their affairs, of periodicals advising their members, stockholders or customers of danger or advantage to their interests from the adoption of measures, or the election to office of men espousing such measures, the gravest doubt would arise in our minds as to its constitutionality" (footnote omitted).

We have previously recognized the necessity of protecting freedom of press and expression on issues of public concern. In *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 252, we said: "One of the chief reasons for freedom of the press is to insure freedom, on the part of individuals and associations of individuals at least, of political discussion of men and measures, in order that the electorate at the polls may express the genuine and informed will of the people."

The people's right to cast their votes freely is the correlative of the Legislature's power to ensure the freedom of elections. The plaintiffs' right not to be silenced completely on referenda issues that materially affect them promotes the people's right to exercise an informed will at the polls.

We believe that corporations are not entirely unprotected by the First Amendment in the circumstances before us. The exercise of an informed vote by the electorate is essential to the freedom of elections. *United States* v. *Congress of Industrial Organizations*, 335 U. S. at 144 (Rutledge, J., concurring). Assuming arguendo that massive influence of the vote from any one sector of the society is an evil to be restrained, nevertheless any law that seeks to curtail a source of expression on elec-

tion questions must be narrowly drawn. It must provide the least restrictive alternative available to accomplish its ends. See *United States* v. *Congress of Industrial Organizations, supra,* at 146 (Rutledge, J., concurring). Although a corporation's expression on political issues is subject to some restraint, we hold that in the absence of a compelling State interest showing that *any* amount of corporate expression, however small, on election questions results in undue influence over the electoral process, corporations may not be *totally* prohibited from expressing their views on issues that materially affect them. The voters have a right to be informed on referenda issues. The statutory amendment does not meet the requirements of a narrowly drawn law, circumscribing only the evil to be curtailed.

On the record before us we do not reach the general question of the manner, mode and extent to which corporate expression may be limited to ensure free elections.[22] In the circumstances of the case we hold that the 1972 amendment to G. L. c. 55, § 7, which effectively prevents *any* expression by the plaintiffs on the proposed constitutional amendment amounts to impermissible censorship and thus encroaches upon the plaintiffs' freedom of expression in violation of the First and Fourteenth Amendments to the United States Constitution and art. 16 of the Declaration of Rights of the Massachusetts Constitution.

We have thus far addressed ourselves only to the con-

---

[22] In the *Bowe* case, we expressed the view that "labor unions, like individuals, may be curbed by corrupt practices acts and prevented from dumping immense sums of money into political campaigns. But under the proposed law the political activities of labor unions are not regulated or curbed but are substantially destroyed. Deprived of the right to pay any sum of money for . . . advertising in newspapers, or for buying radio time, a union could not carry on any substantial and effective political activity. It could not get its message to the electorate. Its rights of freedom of the press and of peaceable assembly would be crippled." 320 Mass. at 252. Even if it is conceded that the plaintiffs' unrestricted expenditures to publicize their views on referenda is an evil properly curbed by the Legislature, it would not follow that there should be a *total* prohibition upon any such expenditures. See *United States* v. *Congress of Industrial Organizations, supra,* at 145 (Rutledge, J., concurring).

stitutionality of the 1972 amendment of G. L. c. 55, § 7. By striking down that amendment alone and leaving the remainder of the statute operative (*Ashley* v. *Three Justices of the Superior Court,* 228 Mass. 63, 81) the plaintiffs no longer suffer threat of prosecution for their intended actions. Since we have ruled that the plaintiffs' business interests are reasonably considered to be materially affected by the proposed constitutional amendment, the remaining statute provides no curb to the plaintiffs' proposed publication of their views on the forthcoming referendum. Having resolved the controversy before us we need not, at this time, consider the plaintiffs' attacks upon the face of the statute.

As we noted in the *Bowe* case, *supra,* at 245–246, "In many cases it would be difficult or even impossible to say abstractly and unconditionally that a statute is or is not constitutional. In part its provisions may be unconsitutional, yet the remainder may be constitutional. . . . A statute may be unconstitutional as applied to some states of fact, but constitutional as applied to others. . . . Only when the impact of a statute upon particular indivuals, who have both the opportunity and the incentive to defend their rights by argument, and upon a set of definite facts established after genuine controversy, has been shown, can a court decide a constitutional question with confidence that relevant considerations have not been overlooked."

Having struck down the 1972 statutory amendment as constitutionally offensive, we no longer have before us proposed activity that is prohibited by the statute and the controversy no longer exists. Our statutory authority to give declaratory relief under G. L. c. 231A, § 1, inserted by St. 1945, c. 582, § 1, is circumscribed by the requirement that "an actual controversy has arisen and is specifically set forth in the pleadings." We think that it is clear from the pleadings that the actual controversy between the parties focused specifically on the plaintiffs' intended publication of their views on the proposed constitutional amendment. The plaintiffs do not indicate

that they wish to contribute to political campaigns generally or to aid, promote or prevent the nomination or election of any person to public office, nor indeed do they indicate that they wish to violate any of the provisions of § 7 except the 1972 amendment which we have held unconstitutional. Questions as to the constitutionality of c. 55, § 7, as it now remains there may be, but we reserve our consideration or decision of such questions for an appropriate case.[23]

QUIRICO, J. (with whom Justices Braucher and Kaplan join, concurring in the result) General Laws c. 55, § 7, as appearing in St. 1946, c. 537, § 10, provided in part that "no business corporation incorporated under the laws of . . . the commonwealth . . . shall directly or indirectly give, pay, expend or contribute, or promise to give, pay, expend or contribute, any money or other valuable thing for the purpose of . . . influencing or affecting the vote on any question submitted to the voters, *other than one materially affecting any of the property, business or assets of the corporation*" (emphasis supplied). In *Lustwerk* v. *Lytron, Inc.* 344 Mass. 647, 648, decided in 1962, we held that this statute did not prohibit a corporation from expending money "for the purpose of influencing the voters to vote against the [proposed] so-called graduated income tax amendment" to our Constitution in the election to be held that year. In that opinion we said at 651 that "[t]he proposed constitutional amendment if adopted, in various respects, will give to the Legislature a substantially broader power than now exists to impose income taxes upon corporations and in-

---

[23] A specific controversy focused upon the other prohibitions contained in G. L. c. 55, § 7, should provide us with a more concrete and adequate record which might reveal, among other things, why corporations need to contribute to candidates and parties when they are free to spend money on referendum questions that materially affect them. Such a record should also discuss whether the potential abuse of corporate economic power in contributing to candidates or parties presents a more serious threat to the freedom of elections than the use of such power to influence the vote on referrendum questions.

dividuals within Massachusetts." The proposed constitutional amendment involved in that case was rejected by the people on November 6, 1962.

The people will again be asked to vote on a "so-called graduated income tax amendment" at the election to be held on November 7, 1972. Despite the use of different language in the present proposal, its effect would be the same as that of the 1962 proposal in that both would authorize the Legislature to impose a graduated income tax on individuals and corporations. The plaintiff corporations desire to expend money to influence the vote of the people at the forthcoming election on the question of the adoption or rejection of the proposed amendment. The only thing which has changed since our decision in the *Lustwerk* case is that St. 1972, c. 458, approved June 20, 1972, with an emergency preamble, amended G. L. c. 55, § 7, by adding thereto the following: "No question submitted to the voters concerning the taxation of the income, property or transactions of individuals shall be deemed materially to affect the property, business or assets of the corporation." Does the addition of this sentence to § 7 make any significant difference between the facts involved, the question to be answered, or the result in the *Lustwerk* case and the present case? In my opinion it does not.

The amendments proposed in both the *Lustwerk* case and the present case would "give to the Legislature a substantially broader power than now exists to impose income taxes upon corporations" as well as upon individuals (the *Lustwerk* case at 651). Therefore the constitutional amendment now proposed must be held to be "one materially affecting" the property, business or assets of the plaintiff corporations, within the meaning of the first sentence of G. L. c. 55, § 7, unless a different conclusion is required by the sentence added to § 7 by St. 1972, c. 458. In my opinion the statutory amendment does not require a different conclusion.

We must consider the statute as a whole, and try to give effect to all of its provisions, regarding none of them

as superfluous, "so that the enactment considered as a whole shall constitute a consistent and harmonious statutory provision capable of effectuating the presumed intention of the Legislature." *Bolster* v. *Commissioner of Corps. & Taxn.* 319 Mass. 81, 85. Both before and after the 1972 amendment, § 7 expressly recognized the right of a corporation to expend money to influence the vote of the people on a question "materially affecting any of the property, business or assets of the corporation." The 1972 amendment which added a sentence to § 7 appears to have been intended to preclude any claim by a corporation that it would be entitled to expend money to influence the vote of the people on a question which, although expressly limited to "the taxation of the income, property or transactions of individuals," in fact affects "the property, business or assets of the corporation." The plaintiffs make just such a claim here, viz., that the imposition of a graduated income tax on their officers and employees, particularly those in the higher income brackets, and on their stockholders or policyholders would materially affect "the property, business or assets of the corporation[s]." In my opinion the right of the plaintiff corporations to make the proposed expenditures which are at issue does not derive from or depend on this alleged indirect effect which a graduated income tax on individuals might have on the corporate property, business or assets, but rather it exists by virtue of the direct effect which a graduated income tax on corporations might have thereon. The 1972 preclusion of corporate authority to expend money on questions having only such an indirect effect on their property, business or assets did not in any way, or to any extent or degree, either repeal or diminish the corporate right, recognized in another portion of the statute, to expend money to influence the vote of the people on questions which might directly affect the corporate property, business or assets, even if the expenditure involves comment on the taxation of individuals.

This interpretation of G. L. c. 55, § 7, as amended

through St. 1972, c. 458, makes it unnecessary to consider or pass upon the serious constitutional attack leveled against it by the plaintiffs on the basis of their assumption that it should be construed to prohibit the expenditures which they desire to make. See *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230, 249–252; Rosenthal, Federal Regulation of Campaign Finance: Some Constitutional Questions (Study No. 18, Citizens' Research Foundation); Comment, Free Speech Implications of Campaign Expenditure Ceilings, 7 Harvard Civil Rights — Civil Liberties L. Rev. 214. The Supreme Court of the United States has on several occasions avoided ruling directly upon the constitutionality of the Federal Corrupt Practices Act (18 U. S. C. § 610 [1970]), which presents comparable issues. *United States* v. *Congress of Industrial Organizations,* 335 U. S. 106, 110. *United States* v. *International Union United Auto., Aircraft & Agricultural Implement Wkrs. of Am. (UAW–CIO),* 352 U. S. 567, 590–592. *Pipefitters Local Union No. 562* v. *United States,* 407 U. S. 385, 400.

In *Ashwander* v. *Tennessee Valley Authy.* 297 U. S. 288, Mr. Justice Brandeis in a concurring opinion (pp. 346–348) set forth a "series of rules" which he said that court "developed, for its own governance in the cases confessedly within its jurisdiction, . . . under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." Included in the rules were the following: "4. The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. . . . Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. . . . 7. 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is riased, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which

the question may be avoided.' *Crowell* v. *Benson*, 285 U. S. 22, 62."

These same rules of statutory construction have long been applied by this court. This is an appropriate case for the application of this self-imposed judicial inhibition against announcing constitutional rulings which are not "absolutely necessary to a decision of the case." *Burton* v. *United States*, 196 U. S. 283, 295. *United States* v. *International Union United Auto., Aircraft & Agricultural Implement Wkrs. of Am. (UAW–CIO)*, 352 U. S. 567, 590. We have said frequently that a statute "will not be declared void unless it is impossible by any reasonable construction to interpret its provisions in harmony with the Constitution." *Perkins* v. *Westwood*, 226 Mass. 268, 271, and cases cited. *Supreme Malt Prod. Co. Inc.* v. *Alcoholic Beverages Control Commn.* 334 Mass. 59, 61. The rule has also been said to be that "where a statute may be construed as either constitutional or unconstitutional, a construction will be adopted which avoids an unconstitutional interpretation." *Demetropolos* v. *Commonwealth*, 342 Mass. 658, 660. In *Opinion of the Justices*, 341 Mass. 760, 785, we said: "In the light of all these principles, to avoid serious constitutional doubts . . . we are constrained to interpret the second sentence of the proposed § 6A sufficiently narrowly to ensure its constitutional validity." See *Ferguson* v. *Commissioner of Corps. & Taxn.* 316 Mass. 318, 323–324; *Bay State Harness Horse Racing & Breeding Assn. Inc.* v. *State Racing Commn.* 342 Mass. 694, 699; *Vaughan* v. *Max's Mkt. Inc.* 343 Mass. 394, 397; *State Tax Commn.* v. *Wheatland,* 343 Mass. 650, 653–654; *Boston Safe Deposit & Trust Co.* v. *State Tax Commn.* 346 Mass. 100, 106; *Commonwealth* v. *Benoit*, 347 Mass. 1, 6; *Staman* v. *Assessors of Chatham*, 351 Mass. 479, 486–487.

Therefore, I concur with the result accomplished by the order entered by this court on October 13, 1972, to the effect that G. L. c. 55, § 7, as amended through St. 1972, c. 458, is not effective to prohibit the plaintiffs from making the proposed expenditures which are in issue in

this case. I do so solely as a matter of interpretation of this statute, without reaching or intimating any opinion on the broad constitutional question whether the Legislature has power to enact statutes either prohibiting or otherwise controlling the expenditure of money by corporations for political purposes. I avoid the strong temptation to engage in a discussion of this interesting constitutional question, not because it is a difficult question, but because it is unnecessary to do so for the decision of this case.