**FUR INFORMATION AND FASHION COUNCIL, INC., et al., Plaintiffs,**

v.

**E. F. TIMME & SON, INC., Defendant.**

**No. 73 Civ. 993.**

United States District Court,
S. D. New York.

Sept. 21, 1973.

Nims, Howes, Collison & Isner, by Oliver P. Howes, Jr., and Kenneth R. Umans, New York City, for plaintiffs.

Gifford, Woody, Carter & Hays, New York City, by Charles L. Trowbridge and David E. Nierenberg, New York City, of counsel, for defendant.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

This action was commenced March 7, 1973 by nine corporate plaintiffs, suing for themselves and a purported class of persons said to comprise all those engaged in the American fur industry. No determination has yet been made by the Court as to whether the litigation may be maintained as a class action. Plaintiffs include a not-for-profit New York corporation, Fur Information and Fashion Council, Inc., which is a trade association of manufacturers, retailers, dealers and dressers of furs used in the apparel industry. This plaintiff, through its Fur Conservation Institute and American Fur Industry divisions conducts advertising and public relations campaigns in the interests of all segments of the American fur industry, and seeks to promote the use of furs by the ultimate consumer. Plaintiffs also include (1) and (2) two more trade associations, consisting of persons engaged in the fur manufacturing industry; (3) a, trade association of fur wholesalers; (4) an asscociation consisting of retailers; (5) a joint council of local labor unions within this District, whose members engage in the manufacture of fur garments; (6) a retailer of fur garments; (7) a fur garment manufacturer; and (8) a wholesaler of such apparel. The status and nature of activities conducted by the various plaintiffs are fully stated in paragraphs 3 through 15 of the Complaint.

Defendant ("Timme") a New York corporation, manufactures synthetic yarn fabrics in various designs, collectively referred to as "Timme Fake Furs" or "Timmetation Fur".[1] It sells to the cutting trade, for the manufacture of wearing apparel, including imitation fur coats which have a physical appearance superficially resembling tiger, leopard, cheetah, jaguar, seal, ocelot and otter.

There is no diversity of citizenship. Jurisdiction is asserted based upon the Lanham Trademark Act of 1946, as amended. 15 U.S.C. §§ 1051–1127, and more specifically § 43(a) thereof [15 U.S.C. § 1125(a)] and 28 U.S.C. § 1338.[2]

By the first cause of action pleaded, plaintiffs show their financial stake, and that of the purported class, in the continued good will of their industry, and the public acceptance of real fur garments, and assert, without contradiction, that they and others have expended considerable money and effort in promoting their industry through institutional advertising and the use of professional public relations consultants.

Plaintiffs claim that they, and the purported class are specially aggrieved by defendant's conduct with respect to its advertising program, claimed to be unlawful and in violation of the Lanham Act provisions previously cited.

As a second cause of action plaintiffs, seeking to impose tort liability, assert that (Complaint, ¶ 34):

"... defendant has engaged in an intentional and systematic compaign to falsely and unfairly disparage (sic) the products marketed by plaintiffs and all others similarly situated and further to destroy the good will and reputation attached to the products. ..."

This cause of action may not be maintained except pursuant to pendent jurisdiction. (See *infra*, p. 19)

On April 27, 1973, defendant answered the complaint by a general denial and six separate affirmative defenses.[3]

While the litigation was pending, and after a pretrial conference had been held to explore settlement, or to expedite preparation of the case for trial, plaintiffs, by an order to show cause, issued September 6, 1973 by Judge Duffy of this Court, moved for a preliminary injunction pending trial, pursuant to Rule 65, F.R.Civ.P. which would in effect prevent the defendant from broadcasting over television in the New York area two (2) certain advertising commercials, in color, sometimes hereinafter referred to as "the Leopard Ad" and "the Tiger Ad", or sometimes collectively as "the ads".[4]

1. Defendant's imitation furs are made from synthetic yarn derived from natural gas.

2. Section 43(a) of the Lanham Act provides in relevant part that:
   "Any person who shall . . . use in connection with any goods . . . any false description or misrepresentation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods . . . to enter into commerce, and any person who shall with knowledge of the falsity of such . . . description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

3. These affirmative defenses are:
   1. the complaint fails to state a claim;
   2. plaintiffs' claims are barred by the applicable statutes of limitation;
   3. the statement of defendant are true, concern matters of public interest, represent their honest opinion, and are not motivated by actual malice;
   4. all statements of fact by defendant are true;
   5. to the extent defendant's statements do not contain statements of fact, they are constitutionally protected expressions of opinion; and
   6. this Court lacks subject matter jurisdiction.

4. Plaintiffs' prayer for relief was
   "1. [t]hat defendant . . . be enjoined and restrained . . . during the pendency of this action and thereafter perpetually: (a) from falsely implying or

An evidentiary hearing has been held, and proof of the parties has been received. Pending disposition of this motion, or until Noon on Friday, September 21, 1973, the parties have stipulated that the Tiger Ad could be exhibited and such exhibition has been continuing since about September 8, 1973, but that the Leopard Ad would be withheld from public view in order that the Court might dispose of the motion, or, alternatively, determine whether a temporary restraining order should be issued pending disposition of the motion.[5]

Under all the circumstances of this litigation, it appears appropriate to consolidate the hearing with respect to the preliminary injunction motion with a trial on the merits pursuant to Rule 65(a)(2), F.R.Civ.P., and it is so ordered.

Tigers and Leopards, together with Jaguars, Ocelots and others listed in 50 C.F.R. § 17, Appendix A (1970), as amended, are endangered species threatened with extinction. Pursuant to the Mason Act, also known as the Endangered Species Conservation Act of 1969 (16 U.S.C. §§ 668aa through 668cc, inclusive), no person or corporation with exceptions not material here, may import into the United States any such endangered animal or its skin. Also the Lacey Act (18 U.S.C. § 43) prohibits interstate transportation of such furs, unlawfully taken by others.

These statutes carry severe criminal penalties. The net effect of the statutes and regulations promulgated thereunder by the Secretary of the Interior is that no plaintiff and no member of the purported class may cut, manufacture or sell furs of such endangered species, nor may any apparel be made or sold therefrom in the United States. The Government, by diligent enforcement, has obtained full compliance. It would be impossible as a practical matter for such high fashion apparel as tiger or leopard coats to be cut, manufactured or sold in the United States, even clandestinely. To do so would require the joint conspiratorial activities of too many persons, needed to design, prepare, assemble, sell and transport the contraband furs, and the risks are simply too great. A new tiger or leopard coat may not be purchased at this time in the United States.

Defendant suggests that it is possible in some of the backward areas of the world to purchase such a coat and for the customer to wear or carry it into the United States as personal clothing. No evidence was received in support of this unlikely suggestion, and the hypothesis is so far fetched that it may be disregarded.

The Court viewed these two Ads. They are produced in color. The fact that 40% of the New York market continues to view television in black and white was the significant motivation for the choice of leopard (with contrasting spots) and tiger (with stripes) over a monochromatic fur.

The Leopard Ad, sixty seconds in length, begins with color scenes of animals in their natural habitat, including hippopotami swimming, antelopes running in a pack and a leopard with her cub.

representing . . . that plaintiffs . . . are responsible in any manner for killing tigers, leopards or importing or using in any way the fur of such animals; (b) from falsely implying or representing . . . that plaintiffs . . . are responsible in any manner for the illegal killing of wildlife of any kind; (c) from falsely implying or representing . . . that the purchasing of defendant's goods will in any manner save the lives of tigers, leopards or any endangered species of wildlife.

2. That defendant be required to account for and pay over to plaintiffs . . . any and all profits derived by it and all damages sustained by plaintiffs by reason of defendant's . . . acts. . . . ."

5. If not restrained, defendant proposes to exhibit both Ads to the New York market and elsewhere at least daily through the week of October 1, 1973, and has made contracts with broadcasters for this presentation.

The leopard is then viewed through what are apparently the sights of a large firearm. The scene fades. A gunshot is heard. The scene shifts to a cocktail party ostensibly in the United States. A fashionably dressed woman admires the leopard coat of another. The voice of an unseen male speaks:

Man's Voice: There are too many women who want leopard coats in the world and too few leopards. Timme makes fake furs every bit as beautiful as the originals. We think people should wear our fake fur and leave the leopards' coats where they belong, on leopards.

Woman: Buy me one before the jungle runs out of them.

Man's Voice: Timme. Makers of Timmetation Fake Furs, and fabrics for just about everything else.

This is followed by a picture of examples of various other Timme fabrics used for upholstery and apparel.

The Tiger Ad, thirty seconds long, is to the same effect. A lovely girl appears in color next to a friendly and affectionate tiger. She says:

He [the tiger] is wearing a real tiger coat. I'm wearing a fake fur by Timme. Although it's virtually impossible to tell the difference, a Timme fur costs far less money. Perhaps even more important, it didn't cost a tiger his life. The beauty of a Timme fake is that you can wear a beautiful coat and he [the tiger] can keep his.

This is followed by the voice of an unseen male, naming Timme as a maker of fake furs and fabrics.

Words are inadequate to describe the mordant effect of these Ads on the viewer. In the Leopard Ad, a woman of fashion makes an insensitive reference to the fact that leopards are threatened with extinction, and requests her escort (not shown on camera) to buy her one before it is too late. Her self-indulgent attitude and frivolous demeanor contrasts directly and unfavorably with the words and tone of the ecologist-announcer.

Persons who would wear natural tiger or leopard coats [and, by extension, all who would wear natural fur] are portrayed as anti-social, anti-environmental, or otherwise in a bad light. The two-fold innuendo exists: (1) by selecting Timmetation fur over natural fur, a customer will save money and save the life of a fur bearing animal, and (2) that the American fur industry is responsible for the killing of endangered tigers and leopards, [and, by extension, are criminals].

As to the tigers and leopards, this representation is, of course, false. To the extent that the Ads imply a customer has a choice between real and artificial tiger and leopard fur, the Ads are also false. If the fur portrayed were a natural fur not listed as an endangered species by the Department of the Interior, for example, beaver, rock seal, rabbit, mink or chinchilla, the Ads arguably would be true.[6]

The admitted reason defendant's advertising agency used tiger and leopard instead of rock seal, mink, rabbit or beaver, also made by Timme, is that these endangered animals, striped and spotted, look better on black and white television than the monochromatic natural furs, which lawfully may be slaughtered, dressed, manufactured and sold for apparel in the United States.

The American fur industry has been attacked relentlessly by persons involved in the now fashionable ecology and environmentalist movement in the country, and has been deprecated by various public figures and leaders of opinion.

6. The fur industry argues that synthetic yarns consume, forever, resources such as natural gas, and causes air and water pollution. It claims that non-endangered furs are renewable, and that the economic value of pelts is an inducement to the preservation of a favorable environment for their growth. The lines are drawn, upon value issues, as to which reasonable [and unreasonable] men may differ.

Among the various opinions and emotional causes in this country there are many vocal persons who regard nature and animals with greater affection than they have for their fellow humans. Some will not eat meat because it entails the slaughtering of animals, and many are "against fur". They believe, in accord with now fashionable ecology, that no wild animals of any species should be slaughtered for their skins, and, indeed, there are elements of public opinion who are also opposed to the use of cultured or ranch raised fur. Since fur is expensive, compared with other clothing, consumer acceptance depends upon fashion and a public view of desirability.

Faced with these many difficulties, the American fur industry has organized, and assessed itself to fund a public relations and advertising campaign carrying its arguments into the marketplace of ideas. Its campaigns, of necessity, have been for the most part defensive. Its public relations consultant has met with resistence on the part of those persons characterized as the "media", who control what is printed or broadcasted. Many of such persons are in the vanguard of the environmentalist movement, and they are "against fur". See testimony of plaintiffs' expert, Mr. Edward M. Stanton, September 18, 1973 transcript at p. 172.

In defendant, we have an advertiser seeking to capitalize on two of the great issues of our time, ecology and environmentalism. It would exploit these issues for profit, at the expense of plaintiffs' good will in order to make the use of its fabrics more fashionable, and at the same time, make the wearing of furs unfashionable or undesirable.

Plaintiffs' expert witness Stanton conceded, however, p. 169, that the American public, in considering the issue of whether it is appropriate to wear fur apparel in these times, does not distinguish in its mind between fur of endangered species, fur of wild species not endangered [whose economic value often impels their preservation], and fur raised on farms. Probably the Timme ads could be rendered arguably truthful, if, instead of an endangered species, the animals shown were those wild animals which lawfully may be taken for fur in the United States. The effect on plaintiffs of such a change would be minimal.

Do the Ads violate the Lanham Act? Plaintiffs urge that they do because they represent, falsely, that the American fur industry kills endangered species.

■ This is not, however, a false representation or description as to *defendant's* goods. The evil sought to be remedied was not the unjustified disparagement of the competitors' goods, but deceit or palming off with respect to the advertisers' own goods. While the Lanham Act has been interpreted to afford relief for a broad range of anticompetitive practices beyond those actionable at common law, not all unfair practices are prohibited by § 43(a). Holsten Import Corp. v. Rheingold Corp., 285 F.Supp. 607 (S.D.N.Y.1968); Bernard Food Industries, Inc. v. Dietene Company, 415 F.2d 1279 (7th Cir.), cert. denied, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1969); Smith-Victor Corp. v. Sylvania Electric Products, Inc., 242 F.Supp. 302, 310 (N.D.Ill.1965); Gold Seal Co. v. Weeks, 129 F.Supp. 928, 940 (D.D.C. 1955), aff'd. sub nom. S. C. Johnson & Son, Inc. v. Gold Seal Co., 97 U.S.App. D.C. 282, 230 F.2d 832 (1956), cert. denied, 352 U.S. 829, 77 S.Ct. 41, 1 L.Ed. 2d 50 (1956).

As stated in the *Gold Seal* case at p. 939 of 129 F.Supp.:

"It [the Lanham Act] means that wrongful diversion of trade resulting from *false description of one's* [own] *products* invades that interest which an honest competitor has in fair business dealings—an interest which the courts should and will protect. . . ." (Italics added.)

■ Defendant's implication that endangered species are being killed for the sale of their skins in the American market, is at most a misrepresentation of the acts or products of others. As such,

it does not represent an unfair competitive practice within the meaning of the Act.

■ A slightly different question is presented with respect to the false implication conveyed by defendant that buying defendant's product will prevent the killing of leopards and tigers. But this does not misrepresent an inherent quality or characteristic of defendant's product. Instead, it implies that the purchase of defendant's product will achieve the result of preventing leopards and tigers from being killed. The legislative history of the Act does not support plaintiffs' view that such misrepresentation is within the purview of § 43(a). Plaintiffs cited no authority which has so applied it.

Even advertisers enjoy first amendment rights, although it is said that product advertising is "less vigorously protected . . . than other forms of speech." Capital Broadcasting Co. v. Mitchell, D.C., 333 F.Supp. 582, 584, aff'd 405 U.S. 1000, 92 S.Ct. 1289, 31 L. Ed.2d 472. Banzhaf v. F. C. C., 132 U. S.App.D.C. 14, 405 F.2d 1082, cert. denied sub nom. American Broadcasting Companies v. F. C. C., 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); Robinson v. American Broadcasting Companies, 441 F.2d 1396 (6th Cir. 1971).

■ While Congress may limit such rights to prevent fraud, copyright infringement or palming off, such limitation must be drawn narrowly, so as to meet the perceived evil, without unnecessary impingement on the right of free speech. This is particularly important in the case of institutional advertising, as this is, which is usually combined with a public relations campaign.[7]

Perhaps Congress could forbid the wilful and false disparagement of an entire industry, but it has not done so. At least where matters of public interest are involved, there could, because of first amendment limitations, be no prior restraint of the sort here sought. Robinson v. American Broadcasting Companies, 441 F.2d 1396, 1400 (6th Cir. 1971); Krebiozen Research Foundation v. Beacon Press, 334 Mass. 86, 134 N.E. 2d 1, cert. denied 352 U.S. 848, 77 S.Ct. 65, 1 L.Ed.2d 58.

As Mr. Justice Douglas, concurring in Cammarano v. United States, 358 U.S. 498, 514, 79 S.Ct. 524, 534, 3 L.Ed.2d 462 (1958) wrote:

"That 'freedom of speech or of the press,' directly guaranteed against encroachment by the Federal Government and safeguarded against state action by the Due Process Clause of the Fourteenth Amendment, is not in terms or by implication confined to discourse of a particular kind and nature. It has often been stressed as essential to the exposition and exchange of political ideas, to the expression of philosophical attitudes, to the flowering of the letters. Important as the First Amendment is to all those cultural ends, it has not been restricted to them. * * * The profit motive should make no difference, for that is an element inherent in the very conception of a press under our system of free enterprise. Those who make their living through exercise of First Amendment rights are no less entitled to its protection than those whose advocacy or promotion is not hitched to a profit motive. We held as much in Follett v. McCormick, 321 U.S. 573 [64 S.Ct. 717, 88 L.Ed. 938]. And I find it difficult to draw a line between that group and those who in other lines of endeavor advertise their wares by different means. Chief Justice Hughes speaking for the Court in Lovell v. Griffin, 303 U.S. 444, 452

---

7. In this context "Public Relations" may be defined as getting the advertising message across as news, features, editorial comment, [e.g. a report of a newsworthy speech made to a trade association about endangered species, or about the fur industry's attempts to foster conservation]. It is cheaper than advertising and carries greater credibility. According to plaintiffs' expert, Stanton, bias against fur in the media makes it difficult for the fur industry to present its side of this important public issue.

[58 S.Ct. 666, 669, 82 L.Ed. 949], defined the First Amendment right with which we now deal in the broadest terms, 'The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.' "

Recourse may not be had to the Courts to resolve the public issue raised by Timme's ads, notwithstanding their falsity.

The relief sought may not be granted, because neither the Lanham Act, nor any other statute, so provides, and because the First Amendment prevents. Although the defense to this action has by tradition, been phrased in terms of "lack of subject matter jurisdiction", as Mr. Justice Black pointed out [Calhoon v. Harvey, 379 U.S. 134 at fn. 9, p. 137, 85 S.Ct. 292, 13 L.Ed.2d 190] in actuality, there has been a failure to state a claim upon which, according to substantive law, relief may be granted, and not a failure of subject matter jurisdiction. The result is that whether for failure to state a claim, or for want of subject matter jurisdiction, the first cause of action must be dismissed. Timme and the furriers must be left to fight their battle in "an uninhibited marketplace of ideas in which truth will ultimately prevail" (quoted from Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367 at 390, 89 S.Ct. 1794 at 1806, 23 L.Ed.2d 371 (1968).

Assuming the Court could grant injunctive relief, sound reasons prevent doing so. If such relief were limited to curing the falsity in the Ads, so that they might still be produced, on the same theme, using a non-endangered species, the benefit to the fur industry would be slight. Plaintiffs' public relations expert, Stanton, testified (p. 181 of September 18, 1973 transcript) that his function "in this current campaign that [he was] assisting the fur people with is designed to resist the overall impact of the conservation movement, the animal lovers, the overall guilt approach that has set in on the use of live animal skins."

Timme, if so enjoined, would have the timing of its fall advertising campaign disrupted, and will expend in excess of $45,000 to produce new commercials. (p. 25 of September 10, 1973 transcript.)

Neither plaintiffs, nor their purported class can show damage flowing solely from Timme's acts, rather than from the concurrent acts of environmentalists attacking the wearing of furs. Annual fur garment sales depend on many variables, including fashion acceptance of new designs, costs of production, interest rates, consumer prosperity and the supply of raw material, so that it cannot be said that defendant's activities are or will be directly causative of any financial damage, or financial damage in any particular amount. There are such a number of independent actors, operating jointly, that to enjoin Timme while the others lawfully may continue to enjoy their first amendment rights, would be foolish.

This leaves us with the second cause of action pleaded, which charges tortious conduct under New York law.

As a matter of discretion [*Cf.* Leather's Best v. S. S. Mormaclynx, 451 F.2d 800, 809 (2d Cir. 1971)], we had best decline to exercise pendent jurisdiction and leave for resolution by the state court the question whether, under state law a justiciable issue is presented. *Cf.* Schutzman v. News Syndicate Co., 60 Misc.2d 827, 304 N.Y.S.2d 167; Fashion Two Twenty, Inc. v. Steinberg, 339 F. Supp. 836 (E.D.N.Y. 1971).

The Complaint is dismissed, and the motion for injunctive relief is denied. The foregoing constitutes findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

The Clerk shall enter final judgment that all relief shall be denied, pursuant to Rule 58, F.R.Civ.P.