CCS COMMUNICATION CONTROL, INC., Plaintiff,

v.

LAW ENFORCEMENT ASSOCIATES, INC., Defendant.

CCS COMMUNICATION CONTROL OF ILLINOIS, INC., Plaintiff,

v.

LAW ENFORCEMENT ASSOCIATES, INC., Defendant.

COMMUNICATION CONTROL SYSTEMS, LTD. OF CALIFORNIA, Plaintiff,

v.

LAW ENFORCEMENT ASSOCIATES, INC., Defendants.

CCS COMMUNICATION CONTROL SYSTEM, INC., Plaintiff,

v.

LAW ENFORCEMENT ASSOCIATES, INC., Defendant.

Nos. 84 Civ. 1274 (RWS), 85 Civ. 6672 (RWS), 85 Civ. 7298 (RWS) and 85 Civ. 8492 (RWS).

United States District Court, S.D. New York.

Feb. 21, 1986.

Harold Wm. Suckenick, New York City, for plaintiff.

Walter B. Udell, Philadelphia, Pa., Anthony J. Casella, Gerald E. Hespos, New York City, for defendants.

## OPINION

SWEET, District Judge.

Plaintiff CCS Communication Control, Inc. ("CCS") and defendant Law Enforcement Associates, Inc. ("LEA") have cross-moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on the grounds that there are no genuine issues of material fact disputed by the parties, and that each is entitled to judgment as a matter of law. Because there are no disputed facts which require a trial on the merits, and because CCS has failed to establish the validity of its claim of trademark infringement under the Lanham Trademark Act, 15 U.S.C. § 1051 *et seq.* (hereinafter "Lanham Act"), LEA's motion for summary judgment is granted.

**Prior Proceedings**

CCS commenced this action in the Southern District of New York on February 23, 1984 claiming that LEA had engaged in trademark infringement, copyright infringement and unfair competition with respect to its marketing and advertising of an executive telephone system manufactured by CCS. CCS then withdrew its claims of trademark and copyright infringement with prejudice, leaving only the claim of unfair competition described in Counts II and IV of CCS' complaint. Subsequent to this filing, CCS commenced three substantially identical actions against corporations wholly owned or controlled by LEA in California, Illinois, and Texas which were transferred to the Southern District of New York. By order of November 16, 1985, this court consolidated these actions and pleadings.

At the second status conference in this action on November 22, 1985, this court enjoined CCS from filing any further actions against LEA based on the same charges, and gave LEA until December 6, 1985 to file a motion for summary judgment. On December 6, 1985 LEA filed its motion for summary judgment, and on December 17, 1985 CCS gave notice and filed its cross-motion.

**Facts**

The following facts are undisputed by the parties. In early 1983, LEA received one of CCS' products as a trade-in, an executive telephone with voice-mask and scrambler, labeled Model No. CC–800 (hereinafter the "CC–800") which LEA photographed and placed in its 1983–84 catalog which was compiled by Carl Lande, the former president of LEA. The CC–800 appeared at page 10 of the LEA 1983–84 catalog [Exhibit E] in a photograph too small to reveal any markings of the manufacturer. An examination of a different photograph of the CC–800 reveals that all of CCS' markings, including its name, are still affixed to the product. Larger photographs of other merchandise on page 11 of the catalog display the product manufacturer's name.

In September, 1983, Spencer Lawrence ("Lawrence"), current vice-president and chief executive officer of LEA, received a telephone call from Jim Barker of Playboy Magazine, who informed him that the magazine wanted to do a follow-up story on executive security devices which it had published the previous year. Lawrence agreed to lend Barker any products he wished to use for the article and instructed his vice president for U.S. Sales, Philip Rosen ("Rosen"), to ship any items which Playboy

requested. According to Rosen, whose affidavit is uncontroverted, Barker selected eight items from the LEA catalog to be shipped without consulting LEA about the items, one of which was the CC–800. Of the eight items shipped to Playboy, only two were selected for the article—the CC–800 and a cigar humidor bug detector—both of which were photographed by Playboy and returned to LEA. According to the Lawrence affidavit, neither he nor Rosen saw the text of the article before it was published.

The article appeared in the March, 1984 issue of the magazine and was entitled "The Executive James Bond," and the CC–800 Executive Communications Security System briefcase appeared on a page with four other security devices. The caption beside the photograph of the CC–800 stated that it was "from LEA," and the two photographs above had captions ending in "by Wilson Jones Company" and "by Research Electronics." Because of the small size of the photograph and the fact that the briefcase lid was hinged over the components, the CCS identification markers were not visible on the item.

According to Rosen, the CC–800 generated approximately twelve telephone inquiries, six of which occurred prior to the publication of the Playboy article. Rosen asserts that he never stated that LEA manufactured the Executive Communication System but rather advised inquirers that the component parts of the communication system could be purchased at a much lower cost using equivalent or superior components. Rosen indicated that CCS' price for its CC–800 was $7,800.00, whereas the components integrated into one case by LEA would have sold for approximately $3,500.00.

LEA never sold its single CC–800 and the photograph has been marked "discontinued" in LEA's catalog. LEA never sold a comparable assembled unit of its own component parts. The Lawrence affidavit attests that LEA's sales of component parts of an executive communication system for the twelve month period prior to and after publication of the article were substantially as follows:

|  | Before Article | After Article |
|---|---|---|
| Telephone Scrambler, Model 3100 | 115 | 86 |
| Anti-Spy Telephone, Model 4400 | 30 | 24 |
| Voice Mask, Model 3600–001 | 4 | 5 |

The remaining two components of the system, the tape recorder and line control switch, are sold in volume and cannot be correlated to the purchase of executive communications systems.

**Discussion**

The remaining elements of CCS' claim are contained in Counts II and IV of the complaint, which allege unfair competition by LEA in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Paragraphs 5, 10 and 11 of the complaint allege that LEA falsely described or represented the CC–800 as its own products in its catalog, that LEA caused this misrepresentation to be circulated in the media through the Playboy article, and that LEA copied and sold a unit similar to the CC–800. In addition to these claims, CCS argues in its memorandum of law that LEA used the photograph of the CC–800 in the Playboy article to sell its own competing product, also in contravention of Section 43(a).

Section 43 of the Lanham Act created a federal statutory tort of false representation of goods in commerce. It provides in relevant part:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any

person doing business in the locality falsely indicated as that of the origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a).

CCS claims that both the magazine article and the picture of the CC–800 in LEA's catalog establish a "false designation of origin" within the meaning of section 43(a). However, a close examination of CCS' claims shows that LEA has not "palmed-off" its goods as those of CCS, and has not used the picture of the CC–800 in its catalog to sell its own version of the product.

■ "Palming-off"—where a trader sells his product as that of another—is a classic violation of the Lanham Trademark Act and is actionable *per se*. *Fur Information and Fashion Council, Inc. v. E.F. Timme & Son, Inc.*, 364 F.Supp. 16 (S.D.N.Y.1973), *aff'd*, 501 F.2d 1048 (2d Cir.1974); *Pic Design Corp. v. Sterling Precision Corp.*, 231 F.Supp. 106, 113 (S.D.N.Y.1964). The focus of the prohibition is to prevent a manufacturer from deliberately using a competitor's trademark or packaging design to divert business to the sales of his own product. *Sutton Cosmetics (P.R.), Inc. v. Lander Co.*, 455 F.2d 285, 288 (2d Cir.1972). Thus the words of section 43(a) prohibit a competing manufacturer from attempting to identify another producers' goods as his own, for example by affixing the distinctive markings of that product on his own.

■ While CCS has not raised a claim that LEA attempted to sell its own products by "disguising" them as those of CCS, CCS claims can be construed as "reverse palming-off"; that LEA removed CCS' markings from the product and replaced them with its own, reselling them to customers. *Pic Design Corporation v. Sterling Precision Corp., supra*, 231 F.Supp. at 113. The undisputed facts establish, however, that this claim cannot be substantiated. First, LEA has submitted photographs of the single CC–800 unit in its

possession to demonstrate that LEA never removed any of CCS' markings or identifications on the unit. It has also demonstrated that the absence of CCS' name from the picture in the 1983–84 catalog was caused by the need to reduce the photograph and by the small size of the CCS lettering on the unit. In larger photographs of other catalog items, and on items with larger lettering, the manufacturers' name is visible.

Nor has CCS demonstrated that LEA replaced CCS' designations with its own. LEA was entitled to possess and sell the CC–800 in its catalog and in no way indicated that LEA was the manufacturer of the product. Indeed, the courts of this district have held that the receipt of an item, manufactured by another producer, the removal of its identifying letters and its resale is not a violation of the Lanham Trademark Act because it "makes actionable the *application* of 'a false designation of origin,' not the removal of a true designation." *Id.* at 115 (emphasis in original).

While CCS claims that LEA applied its name to the CC–800 by causing it to appear without CCS' logo in the magazine article over the caption "from LEA," CCS has not produced any evidence which links LEA to the production of the article. LEA's affidavit evidence shows that the company's sole involvement with the article was its initial cooperation in sending Playboy the items which it selected from the 1983–84 catalog. Playboy took its own photographs of the items and returned them to LEA. Furthermore, the caption "from LEA," when juxtaposed against items on the same page labeled "by company X" indicate that "from LEA" represents *"available* from LEA," whereas "by company X" designates *"manufactured* by company X."

■ CCS also contends that LEA used the photograph of the CC–800 to advertise its own products, a tactic also prohibited by the Lanham Act. While the use of a picture of another manufacturers product to advertise your own is a clear violation, *L'Aiglon Apparel, Inc. v. Lana Lobell,*

*Inc.,* 214 F.2d 649 (3d Cir.1954); *American Optical Company v. Rayex Corporation,* 266 F.Supp. 342 (S.D.N.Y.1966), *aff'd,* 394 F.2d 155 (2d Cir.1968), the events surrounding the advertisement of the CC–800 do not establish such a violation.

The essence of any claim of such an advertising "bait and switch" is that the manufacturer attempts to capitalize on the appearance of the competitors product in order to aid its own sales effort. The cases cited by CCS which granted injunctions on such claims support this understanding of the nature of the claim. For example, in *National Dynamics Corp. v. John Surrey Ltd.,* 238 F.Supp. 422 (S.D.N.Y.1963), the defendant used a picture of plaintiff's defroster gun and its trademark "Quickee" in its catalog, although it intended to fill all orders resulting from that picture with a product of lesser quality manufactured in Japan. Similarly, in *Ideal Toy Corporation v. FAB–LU, Ltd.,* 261 F.Supp. 238 (S.D.N.Y.1966), a doll manufacturer had deliberately and purposefully had copies of his competitors' successful dolls manufactured in Hong Kong, sending the dolls of his competitor to serve as models for the copies. The defendant authorized photographs of the plaintiff's dolls to be made and placed in trade publications to sell his copies, and the court found that the defendant had used the photograph of his competitors doll to sell his own.

Finally, in *Matsushita Electric Corp. of America v. Solar Sound Systems, Inc.,* 381 F.Supp. 64 (S.D.N.Y.1974) the seller of portable radios had removed the plaintiff's name from a competing radio, had affixed its own name to the product and had photographed the misbranded article in order to solicit orders for its own product.

▉ In all three cases the defendants exploited the recognized brand name and image of the plaintiffs' product by associating its own trade name with the competing product, by taking the photograph of that product and by filling all requests for the product with its own similar version of the article. These are not the factual circumstances here LEA did not affix any of its own markings to the CC–800 but merely placed the unit in its 1983–84 catalog. CCS has not demonstrated that LEA intended anything more than to sell its single expensive unit to an inquiring customer. Furthermore, there is no evidence that LEA had a competing unit which it intended to sell, and it is undisputed that neither the single CC–800 nor a model constructed from LEA's components was ever sold by LEA. The Rosen affidavit indicates that he advised inquiries that LEA could produce a unit similar to the CC–800 at a cheaper price, but that he never assembled such a unit, and the sales figures for these components declined after the appearance of the article in Playboy. LEA's disparagement of the CC–800 demonstrates that it was not intending to confuse customers into believing that the CC–800 was its own item, and there is no evidence to indicate that LEA ever intended to produce an executive communication security set. Disparagement of a competitor's goods is not actionable under the Lanham Act. As the court stated in *Fur Information & Fashion Council, Inc. v. E.F. Timme & Son, Inc., supra,* 364 F.Supp. at 21 (emphasis in original):

> This is not, however, a false representation or description as to *defendants* goods. The evil sought to be remedied was not the unjustified disparagement of the competitors' goods, but deceit or palming-off with respect to the advertisers own goods.

In short, CCS has not demonstrated that LEA attempted to use the catalog advertisement or the magazine article to sell its own competing product, or to sell anything other than the single CC–800 unit in its possession.

For the aforementioned reasons, LEA is entitled to summary judgment, and there is no need for this court to rule upon LEA's asserted "unclean hands" defense or to rule on the question of damages. This case is therefore dismissed.

IT IS SO ORDERED.